**ALLEN–MYLAND, INC.**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION.**

Civ. A. No. 85–6166.

United States District Court, E.D. Pennsylvania.

July 21, 1988.

Bancroft Haviland, Philadelphia, Pa., Robert G. Levy, Berryl Speert, Allan Hillman, Cynthia Leppert, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for Allen–Myland, Inc.

Sandra K. Manning, Cravath, Swaine & Moore (pro hac vice), Richard A. Solomon, Robert J. Marvin, Jr., Davis, Markel & Edwards, New York City, Conrad & O'Brien, Philadelphia, Pa., Robert N. Feltoon, Kaare Phillips, Evan R. Chesler, Richard W. Clary, Eric M. Nelson, Cravath, Swaine & Moore, New York City, Steven M. Edwards, Howard Weber, Davis, Markel, Dwyer & Edwards, James Szymanski,

Paula L. Liang, New York City, for Intern. Business Machines Corp.

## MEMORANDUM

O'NEILL, District Judge.

AMI brought this action asserting federal and state law claims against IBM,[1] which filed several counterclaims.[2] The parties agreed to try the liability aspect of AMI's claim under Section 1 of the Sherman Act[3] separately. AMI's claim has two parts:[4] AMI alleges that IBM's net pricing policy constitutes an unlawful tying arrangement and that IBM's Installation and Warranty Service Charge constitutes an unreasonable restraint of trade. The issues were tried before me non-jury;[5] this memorandum constitutes my findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a). Jurisdiction over the Section 1 claims is based on 28 U.S.C. § 1337. Suit is brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## NET PRICING

An IBM 308X net priced upgrade is an MES (Miscellaneous Equipment Specification) or feature (a specific set of computer products) that is installed in an IBM model 308X computer by removing parts from the computer and replacing them with different parts. Ritchie, Tr. 1076–77; Rizzo, Tr. 1188–90. Generally, the purpose of any upgrade (308X upgrades included) is to enhance the performance of the computer, often to increase the capabilities of a used computer to match the performance level

---

1. In Count I of the complaint, AMI charges IBM with violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; in Count II, with a violation of Section 2, 15 U.S.C. § 2; in Count III, with unfair competition; and in Count IV, with tortious interference with business relationships and prospective business relationships. At trial, AMI dismissed with prejudice Count III of its complaint. AMI, *Opening Statement*, Tr. at 3.

2. In its first counterclaim, IBM charges AMI with breach of contract; in the second counterclaim, with tortious interference with the performance of contracts; and in the third, fourth, and fifth counterclaims, with copyright infringement.

3. Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or

otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1.

4. AMI's Section 1 claim contains a third part, based on IBM's alleged interference with AMI's ability to acquire parts from independent firms, *see* Complaint, ¶ 28(b), but the parties agreed not to raise this issue at the initial trial.

5. This case was initially assigned to the Honorable Clarence C. Newcomer, U.S. District Court Judge for the Eastern District of Pennsylvania. It was reassigned to me on January 28, 1987. Trial began on February 3, 1987.

of a newer model. Upgrades include model upgrades (MIPS upgrades), increases in memory capacity (memory upgrades), and increases in the number of computer channels (channel upgrades). *See* Ritchie, Tr. 1077; Bigando, Tr. 1232; Lynn, Dep.Tr. 62.

IBM 308X net priced upgrade contracts provide that the installation and removal of parts is to be performed by IBM employees, and that the removed parts become the property of IBM and are returned to the company.[6] Ritchie, Tr. 1086–87; Rizzo, Tr. 1188–90; Levin, Tr. 78–80, 744; PX 139; PX 140; PX 138. IBM issues its net priced upgrade customers a credit for the parts removed by IBM engineers during the installation of a net-priced MES. *E.g.,* Levin, Tr. 78; PX 457; PX 145. A customer who purchases a net priced upgrade from IBM is not charged separately for the labor associated with performing the upgrade. *See* DX 829. The customer receives a single price quotation for the final, installed product.[7]

IBM's 308X product line consists of 14 models with a performance power range of 3 to 30 million instructions per second (MIPS), and a price range of $960,000 (3083E) to $6,300,000 (3084Q). *See* DX 1799. Upgrades are net priced only if they involve the removal and return of parts (such as TCMs)[8] from the upgraded computer. The majority of MIPS upgrades,[9] *see* Levin, Tr. 78, and numerous memory upgrades[10] are net priced by IBM.

Upgrades which do not require the removal of TCMs or other parts (such as the 3083J to 3081K model upgrade) are not net priced and are optionally available from IBM on an SWRPQ basis; *i.e.,* without IBM's labor included.[11] An upgrade purchased on an SWRPQ basis may be installed by third parties, such as AMI, or by IBM, if the customer chooses and pays for the service. All 308X channel upgrades and many memory upgrades are available on an SWRPQ basis.

6. IBM decided to apply net pricing to the 308X line of computers in 1980. The first 308X computer (the 3081D) was announced in November of 1980. DX 1799. However, IBM also had a net pricing policy with respect to the earlier line of 303X computers; many, perhaps all, 303X MIPS upgrades were net priced. *See* A.P.F. at ¶ 118; Allen, Tr. 286–288. Net pricing was first implemented in the late 1960's. Ritchie, Tr. 1078. AMI challenges net pricing only as it applies to the 308X line of computers.

7. Computer manufacturers other than IBM generally quote a single price for the parts and labor included in upgrades. *See* English, Tr. 1566–67 (Burroughs); Ramsburg Dep. Tr. 6–7 (Control Data Corporation); Nielson Dep. Tr. 7 (NCR); Ikezoye, Dep. Tr. 6–7 (Hewlett Packard); Gibbs, Dep. Tr. 5–6 (Prime Computer); Edstrom, Dep. Tr. 4–5 (Amdahl Corporation); *see also* MacNaughton Study, DX 1634, pp. 1–3. AMI "often" or "usually" charges its customers a single price for parts and labor when it installs an upgrade or feature for its customers. *See, e.g.,* Lewis, Tr. 492, 502, 1735; Smith, Tr. 613–14; Loria, Tr. 676. UCS (Ultimate Computer Services), one of AMI's principal competitors, "normally" also charged a single price for an installed upgrade or feature. LaRocca, Tr. 1164–65.

8. TCMs (Thermal Conductor Modules) will be discussed in greater detail below. *See infra* pp. 278–280, 283. Here I note only that the recovery of TCMs from 308X computers being upgraded was a major reason for implementing

the net pricing policy. *E.g.,* Armstrong, Tr. 902.

9. The following 308X model (MIPS) upgrades are net priced: 3081 D to 3801 K; 3081 G to 3081 K; 3081 GX to 3081 KX; 3081 K to 3084 Q; 3081 KX to 3084 QX; 3082 16 and 24 to Q 48; 3082 X 16 and X 24 to X 48; 3083 B to 3083 J; 3083 B to 3081 G; 3083 B to 3081 K; 3083 BX to 3081 GX; 3083 BX to 3083 JX; 3083 E to 3083 B; 3083 E to 3083 J; 3083 EX to 3083 BX; 3083 JX1 to 3081 KX1. *See* PX 127 at 39895; *see also* Levin, Tr. 78–79; Allen, Tr. 291–292.

10. The following 308X memory upgrades are net priced: 3081G 16, G 24, and G 32 to G 48; 3081 G 16, G 24, and G 32 to G 64; 3081 K 16, K 24 and K 32 to K 48; 3081 K 16, K 24 and K 32 to K 64; 3081 GX1 to 3081 GX2; 3081 GX2 to 3081 GX3; 3081 KX1 to 3081 KX2; 3081 2 to 3081 KX3; 3083 BX0 to 3083 BX1; 3083 BX2 to 3083 BX3; 3083 EX to 3083 EX1; 3083 EX2 to 3083 EX3; 3083 JX0 to 3083 JX1; 3083 JX2 to 3083 JX3; 3084 Q 32, Q 48 and Q 64 to Q 96; 3084 Q 32, Q 48 and Q 64 to QC8; 3084 QX 3 to 3084 QX 4; and 3084 QX 4 to 3084 QX 6. *See* PX 127 at 39895; *see also* Levin, Tr. 78–79. Allen, Tr. 291–292.

11. It is unclear what "SWRPQ" stands for. As Mr. Gibson of IBM stated, "don't ask me what an SWRPQ means, it really doesn't mean anything. But it is simply the MES or an RPQ for that matter priced without IBM labor...." PX 377 at 89707.

AMI asserts that IBM's net pricing of 308X upgrades constitutes an unlawful tying arrangement under Section 1. As ultimately defined by AMI, the alleged tying product consists of the IBM parts necessary to fabricate and install the equivalent of 308X net priced upgrades, and the tied product consists of the engineering services involved in the fabrication and installation of such upgrades.[12] AMI's Post–Trial Reply Memorandum of Law (hereinafter "A.R.M.") at 9.

## I.

A tie exists when a seller refuses to sell a product (the tying product) alone and insists that any buyer who wants it must also purchase another product (the tied product). *See* L. Sullivan, Handbook of the Law of Antitrust § 150, at 431 (1977). "[T]he Sherman Act does not prohibit 'tying', it prohibits 'contract[s] . . . in restraint of trade'." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 21 n. 34, 104 S.Ct. 1551, 1563 n. 34, 80 L.Ed.2d 2 (1984). Only a tying arrangement which imposes an unreasonable restraint of trade is unlawful.

Certain tying arrangements are *per se* unlawful under the antitrust laws; that

is, they are deemed unreasonable as a matter of law and "no specific showing of unreasonable competitive effect is required." *Fortner Enterprises v. United States Steel,* 394 U.S. 495, 498, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969) ("*Fortner I*"); *see generally Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (respecting *per se* unlawful arrangements in general: "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.").[13] A tying arrangement which does not warrant *per se* condemnation may be found to violate the Sherman Act under a rule of reason analysis.[14] *Hyde,* 466 U.S. at 17–18, 104 S.Ct. at 1560–61; *Bogus v. American Speech & Hearing Ass'n,* 582 F.2d 277, 287 (3d Cir.1978). *Per se* rules and the rule of reason are mechanisms "employed 'to form a judgment about the competitive significance of the restraint.'" *NCAA* 468 U.S. at 103, 104 S.Ct. at 2961 (quoting *National Soc'y of Prof. Engineers v. United States,*

---

12. In its complaint, AMI defined the tying product as the parts needed to upgrade IBM large scale main frame computers, and the tied product as IBM installation service. Complaint, at ¶ 28(a). During the course of litigation, AMI also defined the tied product as the engineering labor necessary to reconfigure IBM large scale main frames, *see* Plaintiff's Proposed Findings of Fact and Conclusions of Law (hereinafter "A.P.F.") at ¶ 151, or the engineering services necessary to perform net priced reconfigurations of IBM's large scale main frame computers. *See* Plaintiff's Post–Trial Memorandum of Law (hereinafter "A.M.") at 44.

IBM's net pricing applies only to certain upgrades sold new by IBM. Reconfiguration activities include services as to which IBM's net pricing policy does not apply (e.g., upgrades with used parts, removals and reinstallations of customer-owned parts or upgrades, cycle conversions and refurbishments). *See, e.g.,* PX 105, p. 76525; Levin, Tr. 64; Gibson, Dep. Tr. 35–36. When used by AMI to refer to the tied product, the term reconfiguration must mean only those activities to which net pricing applies.

13. "The rationale for *per se* rules in part is to avoid a burdensome inquiry into actual market conditions in situations where the likelihood of

anticompetitive conduct is so great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct." *Hyde,* 466 U.S. at 15 n. 25, 104 S.Ct. at 1560 n. 25 (citations omitted). However, the per se doctrine in tying cases has always required an elaborate economic analysis. *See id.* at 34, 104 S.Ct. at 1569 (O'Connor, J., concurring). "[T]here is often no bright line separating *per se* from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *National Collegiate Athletic Ass'n v. Bd. of Regents of U. of Oklahoma,* 468 U.S. 85, 104 n. 26, 104 S.Ct. 2948, 2961 n. 26, 82 L.Ed.2d 70 (1984).

14. Four justices in *Hyde,* including Chief Justice Burger and Justice Powell, asserted that all tying arrangements should be analyzed under the rule of reason. 466 U.S. at 35, 104 S.Ct. at 1570 (O'Connor, J., concurring). Many scholars agree. *See Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 671 n. 2 (7th Cir.1985), *cert. denied,* 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986).

435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978)).

## II.

■ AMI contends that IBM's net pricing of 308X upgrades is *per se* unlawful. A.M. at 15. To establish a *per se* tying violation, plaintiff must show: 1) the existence of two separate and distinct products or services and an agreement conditioning the sale of the tying product to the purchase of the tied product; 2) that the seller possesses sufficient economic power with respect to the tying product to restrain free competition appreciably in the market for the tied product; and 3) that the seller has thereby foreclosed a "not insubstantial" amount of interstate commerce in the tied product. *See, e.g., Hyde,* 466 U.S. 2, 104 S.Ct. 1551; *Fortner I,* 394 U.S. 495, 89 S.Ct. 1252; *Columbia Pictures Indus. v. Redd Horne, Inc.,* 749 F.2d 154 (3d Cir. 1984); *Bogus,* 582 F.2d 277 (3d Cir.1978). The Supreme Court's decision in *Hyde,* 466 U.S. 2, 104 S.Ct. 1551, suggests that an inquiry into the legality of a tying arrangement under the *per se* rule requires an elaborate economic analysis.

■ I conclude that IBM's net pricing policy does not warrant *per se* condemnation. AMI has failed to establish that IBM possesses the requisite market power. AMI has also failed to prove that it, or anyone, has been foreclosed from a viable business opportunity as a result of IBM's conduct.[15] My finding that AMI has not been deprived of a viable business opportunity implicates several of the concerns underlying the Sherman Act and the *per se* rule against tying in particular.

### A.

Application of the *per se* rule against tying requires proof that the seller possesses economic power in the market for the tying product. The degree or form of economic power which must be established has been described in various ways. The Supreme Court, however, has consistently held that proof of the existence of monopoly power is not required.

In *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 611, 73 S.Ct. 872, 882, 97 L.Ed. 1277 (1953), in an attempt to define the requisite economic power, the Court referred to "the wielding of monopolistic leverage", or the exploitation by a seller of "his dominant position in one market to expand his empire into the next." This language was "construed" in *Northern Pacific* as requiring only "sufficient economic power to impose an appreciable restraint on free competition in the tied product." 356 U.S. at 11, 78 S.Ct. at 521. "[T]he source from which the power is de-

15. Notwithstanding net pricing, buyers could acquire new 308X upgrade parts from IBM, without IBM installation service included, on an over the counter (OTC) basis. *See, e.g.,* Levin, Tr. 89–97; PX 455; PX 456; PX 457. IBM contends that its sale of the alleged tying and tied products separately precludes application of the *per se* rule against tying. Post Trial Oral Argument, Chesler, Tr. 69–70; *see Northern Pacific,* 356 U.S. at 6 n. 4, 78 S.Ct. at 518 n. 4. ("Of course, where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price."). However, even when the products are sold separately, the *per se* rule may apply if the option is "not viable." *Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55, 62 (4th Cir.1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970)

It appears that IBM's OTC prices for TCMs were not available until late 1983. *See* PX 609; PX 261; PX 269; Smith, Dep. Tr. 158–59. Once established, the OTC prices for 308X upgrade parts typically exceeded the sum of IBM's price for the net priced upgrade and the value of the parts removed from the upgraded machine. Levin, Tr. 89–97; PX 128A–P. For example, in 1983, a 308D machine sold for $3 million and a 308K sold for $3.6 million. A D to K net priced upgrade sold for $600,000. PX 455. The OTC price for the parts required to perform D to K upgrade was $4.58 million. *Id.* The price structure encouraged buyers to buy net-priced upgrades rather than the parts alone for installation by third parties, such as AMI. Although the disparity between the OTC parts prices and the prices for net-priced 308X upgrades was not always as great as in the D to K example (especially when the value of the parts removed and returned to IBM is taken into account), *see* PX 456; PX 457; PX 458, and may have allowed for third-party installation in special circumstances, the OTC option was not, on the whole, sufficiently viable to preclude application of the *per se* rule. This does not mean that the OTC pricing structure was itself unreasonable or unlawful. *See infra,* pp. 296–297.

rived and whether the power takes the form of a monopoly or not" were said to be irrelevant. *Id.* In *Fortner I,* the Court explained that "economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market." 394 U.S. at 502–03, 89 S.Ct. at 1258. For purposes of assessing economic power, the Court stated that the proper focus is "whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." [16] 394 U.S. at 504, 89 S.Ct. at 1259. In *United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 (1977) (*"Fortner II"*), the Court repeated that there is no requirement "that the defendant have a monopoly or even a dominant position throughout the market for a tying product." Instead, the focus of attention is on "whether the seller has the power, within the market of the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market." *Id.* (footnote omitted). "In short," said the Court, the issue is "whether the seller has some advantage not shared by his competitors in the market for the tying product." *Id.*

■ In its most recent tying decision, the Court emphasized the importance of proof that the seller has "some special ability— usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." *Hyde,* 466 U.S. at 13–14, 104 S.Ct. at 1558–59. The focus is on the seller's power to "force" or "coerce":

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's

exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

*Id.* at 12, 104 S.Ct. at 1558. Proof of a seller's power to force involves proof that the seller enjoys "significant market power", *id.* at 26, 104 S.Ct. at 1566, or a "dominant market position." *Id.* at 27, 104 S.Ct. at 1566.

### 1.

■ AMI relies in part on evidence of IBM's market share to support its contention that IBM possesses sufficient economic power to compel application of the *per se* rule. Market share is calculated by reference to a relevant product and geographic market.[17] Briefly stated, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross—elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962). "[T]he purpose of market definition is to determine whether market power exists"; therefore, "market definitions must account for all factors affecting the ability of the [defendant] to raise prices or restrict competition." *Weiss v. York Hosp.,* 745 F.2d 786, 826 (3d Cir. 1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).

For purposes of determining IBM's economic power with respect to the tying product, AMI defines the relevant market as the market for large scale main frame computers. *E.g.* A.P.F. at ¶ 251. According to AMI, a large scale main frame computer is one that is, at the time of its introduction into the market place, among the largest in

---

**16.** Despite the language contained in *Fortner I,* the Court later observed that the treatment of the law on market power in *Fortner I* was in some ways less "far-reaching" than in *Northern Pacific* and *United States v. Loew's Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) (copyright), which could be read to make actual market power irrelevant. *See United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 620 n.

13, 97 S.Ct. 861, 868 n. 13, 51 L.Ed.2d 80 (1977) (*"Fortner II"*) (quoting Dam, 1969 Supreme Court Review, 25–26). *Fortner I* did not change the requirement of proof of "market power in the sense of power over price." *Id.*

**17.** There is no dispute concerning AMI's definition of the relevant geographic market.

memory capacity, the fastest in computing speed, and the most expensive of computers available. Levin, Tr. 752. Large scale mainframes, says AMI, typically are priced in excess of $1.75 million.[18] Levin, Tr. 753. IBM's revenues from the sale of new large scale mainframes (including MES sales) [19] from 1981 to 1985 exceeded $16 billion (1981: $1.918 billion; 1982: $3.07 billion; 1983: $3.589 billion; 1984 $3.807 billion; 1985: $3.666 billion). PX 482; PX 15; PX 48. Based on AMI's definition of what constitute non-IBM large scale main frames [20] and its calculation of the revenues received by firm's selling such products, IBM's share of revenues of all sales of new large scale mainframes was 70.2% in 1981, 78.0% in 1982, 79.0% in 1983, 78.6% in 1894, and 75.9% in 1985. PX 482; PX 15, PX 48. Also based on AMI's definition of what constitute non-IBM large scale main frames, IBM's share of total shipments of large scale main frames (presumably shipment of MESs is included in IBM figures) was 61.0% in 1981, 70.1% in 1982, 76.0% in 1983, 74.5% in 1984, and 65.0% in 1985. PX 483; PX 15, PX 48.

Standing alone, AMI's market share evidence tends to show that IBM enjoys substantial economic power. However, AMI's definitions of large scale mainframes and the relevant market are flawed in several respects and tend to overstate IBM's market share and power.[21]

■ AMI does not expressly include upgrades of large scale main frame computers in its relevant market definition, but does include IBM's revenues from the sale of 308X upgrades in its calculation of IBM's share of the purported relevant market. If it is AMI's contention that upgrades do not belong in the relevant market, then AMI's calculation of IBM's share of the relevant market must be reduced accordingly. However, upgrades of large-scale main frame computers belong in the relevant market. Professor Richard C. Levin, AMI's expert economist, included parts and labor required to upgrade large scale main frame computers in the relevant market consisting of large scale main frame computers. Levin, Tr. 750–51. According to Prof. Levin, the parts and services required for an upgrade, and the upgrade that they together produce, can under certain circumstances be a substitute for a new machine; and "the prices of upgrades are constrained to some extent by the ... prices of computers themselves." *Id.* If upgrades were excluded from the relevant market definition, AMI would have to be excluded from the market, since AMI does not sell large scale mainframes. *See* Levin, Tr. 792.

At trial, Prof. Levin acknowledged that the International Data Corporation report on which AMI relied to determine what computers are large scale main frame computers, *see* Levin, Tr. 783, omits "scores, indeed hundreds of computers available in the marketplace today which have as much or more MIP capacity" as some IBM computers which appear in the survey. Levin, Tr. 786–87; 789. AMI's reliance on IBM documents (PX 15; PX 48) also raises doubts concerning the reliability of AMI's market share data, since it is unclear that

---

**18.** Prior to trial, AMI defined large scale mainframe computers as "electronic data processing systems with a typical systems price in excess of $1 million". *See* AMI's Answers to IBM's Third Set of Interrogatories, No. 2 (Dec. 31, 1986).

**19.** The MES sales included in the calculation consist of IBM sales of MIPs upgrades (model upgrades), memory upgrades, channel upgrades, and other features. A.P.F. at ¶ 3, 14. Between 1982 and 1986, IBM's revenues from the sale of 308X MIPS upgrades exceeded $2 billion. DX 3001B.

**20.** Although AMI includes IBM MES sales in its calculation of IBM large scale mainframe revenues, it does not appear to include non-IBM upgrade sales in the calculation of non-IBM

large scale mainframe revenues. If such upgrades are sold by IBM's competitors, it is a mistake to exclude the revenues they generate.

**21.** The flaws are discussed more fully below. Here I note only that AMI's market share data are limited to new large scale mainframe sales, whereas AMI's alleged relevant market is not limited to new large scale mainframes. It consists of new as well as used large scale mainframes. IBM's share of sales of new computers only partly reflects IBM's power in a market consisting of all largescale mainframes, including those owned by leasing companies and marketed in competition with IBM.

the documents were intended fully to reflect IBM's competition from other manufacturers of large scale mainframe computers. To the extent that AMI's market share evidence reflects the IDC's classification scheme, such evidence tends to overstate IBM's share of the relevant market because it fails to include non-IBM revenues from products which may fairly be described as large scale mainframe computers.

■ Even if AMI's market share evidence properly accounted for all sales of new large scale mainframes, a relevant market consisting solely of large scale main frame computers (and upgrades) is unduly narrow for purposes of assessing IBM's economic power and tends to overstate it.

Substitutes exist for every product and a relevant market definition "cannot meaningfully encompass that infinite range;" therefore, "[t]he circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times Picayune*, 345 U.S. at 612 n. 31, 73 S.Ct. at 882 n. 31 (including general and classified newspaper advertising and excluding advertising placed in other communications media in New Orleans). However, it is also improper "to require that products be fungible to be considered in the relevant market." *United States v. E.I. duPont deNemours & Co.*, 351 U.S. 377, 394, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956) (including cellophane and all flexible wrapping materials in same relevant market in Section 2 case). The relevant market definition must include all "commodities reasonably interchangeable by consumers for the same purposes...." *Id.* at 395, 76 S.Ct. at 1007. It must include all producers which "have the ability—actual or potential —to take significant amounts of business away from each other." *Smithkline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Prof. Levin

substantially agreed with these statements of the considerations pertinent to market definition, *see* Levin, Tr. 171, and acknowledged that products may be in the same relevant market when they are alternatives only "under certain circumstances", or when the pricing of one product constrains the pricing of another only "to some extent." *Id.* at 750–51.

To support its relevant market definition, AMI relies heavily on IBM documents which AMI contends demonstrate that IBM recognizes a separate market for large scale main frame computers. *See* A.M. at 76–77. IBM "Significant Win/Loss Reports" (SWLRs) were monthly reports prepared by IBM's marketing divisions and furnished to IBM's Chairman and members of IBM's Management Committee. Armstrong, Tr. 909–910; Levin, Tr. 756, 800. The SWLRs stated, for each reported competitive situation, the IBM product offering, the competitive product offering(s) faced by IBM, and whether IBM won or lost the sale. Levin, Tr. 756. Prof. Levin examined a sample of SWLRs covering the periods December 1980 through September 1981, April and June 1983, December 1984, January 1985, February 1985, May 1985, and June 1985. *Id.* at 759. For each reported situation in which the IBM product offering was a large scale mainframe (a 3033 product, a 308X product, or MES upgrade of such a product), Prof. Levin classified the reported competitive alternative as a large scale or mid-scale computer, based on the International Data Corporation's "Large Scale Computer Census" classification scheme. *Id* at 757–59. In 281 out of 288 (or 97.6%) reported cases in which the IBM offering was a large scale mainframe, the competitive alternative was also a large scale mainframe or an upgrade to a large scale mainframe. *Id;* PX 480. The competitive alternatives included leasing company placements of new or used large scale mainframes, and leasing company offerings of upgrades or reconfigurations of large scale mainframes.[22]

---

**22.** AMI relies on other IBM documents also reflecting competitive situations involving IBM offerings of large scale mainframes or upgrades to such computers. Although it is not clear who examined the documents, AMI contends that they yield results consistent with Prof. Levin's

The usefulness of IBM's SWLRs and Prof. Levin's analysis of them to support AMI's relevant market definition is limited by several considerations. IBM regarded SWLRs as poor and unrepresentative indicators of actual market activity, and discontinued their use. *See* Armstrong, Tr. 910–13; *see also* Quinlan, Tr. 1050–53, 1057–59; DX 2201.[23] Nevertheless, assuming that SWLRs accurately reflect actual market activity, they show a large number of situations in which non-IBM large scale main frame computers (included by AMI in its relevant market definition) competed with IBM computer offerings which AMI does not include in its market definition.[24] AMI's reliance on only those instances in which the large scale mainframe offering was an IBM computer, rather than a non-IBM computer, is inconsistent with the relevant market definition it advances. Finally, it is worth remembering that "it is not the perceptions of manufacturers but those of consumers which are most salient in the determination of market boundaries." *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 30 (3d Cir.) *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) (footnote omitted) (Section 2).

The evidence compels the conclusion that AMI's asserted market definition is untenably narrow. AMI improperly excludes from its market definition a host of products which provide reasonable alternatives to purchases of large scale mainframe computers and upgrades and constrain IBM's ability to raise the prices of these products or exclude competition. The result is that IBM's market power is significantly less than AMI contends, even before evidence relevant to assessing IBM's economic power other than demand substitutability evidence is considered.

a.

AMI's proposed market definition fails to account for the competition IBM faces from companies offering large scale main frame computers for lease. AMI acknowledges the presence of such competition, *see* A.P.F. at ¶ 21 and the evidence cited therein,[25] but fails to incorporate it into the relevant market definition. An economically meaningful market definition must include all the products and services that actually or potentially compete with IBM products in question or constrain IBM's pricing and product decisions. Levin, Tr. 171.

Leasing companies, such as Comdisco and CMI, purchase computer equipment from manufacturers and lease it to users. From a consumer's standpoint, they are an alternative source of computer equipment. They compete with IBM. *See* Lewis, Tr. 452–3; LaRocca, Tr. 1209; Phillips, Tr. 1586; Pontikes, Dep. Tr. 16; Walker, Dep. Tr. 19–20. Leasing companies own approximately 40 percent of all large scale mainframe computers, as defined by AMI. Levin, Tr. 764–65, 858–9. Prof. Levin testified that IBM's share of the market would be reduced by an amount he was unable to determine if leasing companies were taken into account in AMI's market definition. *See* Levin, Tr. 837–38, 764, 804. If leasing company transactions involving computers comparable and in many cases identical to the large scale mainframes marketed by

---

conclusions based on IBM SWLRs. *See* A.F. ¶¶ 273–275.

**23.** With respect to documents in the preceding footnote, AMI acknowledges that IBM's SWLR's reflect a relatively small percentage of competitive situations. According to the documents, IBM shipped 83 computers per month, and reported 30 situations per month. The documents do not establish the number of competitive situations involving IBM which did not result in a sale and which were not reported. Nor is it clear that every competitive situation which resulted in a sale was reported.

**24.** The same is true with respect to the competitive activity AMI asserts is reflected in the numerous IBM documents neither sampled nor discussed by Prof. Levin. It appears that large scale mainframes competed with products outside AMI's market definition in approximately fifteen percent of all competitive instances in which at least one of the offerings was a large scale mainframe.

**25.** Prof. Levin acknowledged that "[l]easing companies are competitors of IBM when they market IBM manufactured equipment in competition with IBM." Levin, Tr., 764–65; *see also id.* at 758.

IBM are included in the relevant market, and the market is measured on a "transaction basis",[26] IBM's share of the market, according to Prof. Almarin Phillips, who testified for IBM as an expert economist, drops to 34.4 percent. Phillips, Tr. 1600–11; DX 1923. Prof. Phillips testified that such a share would not reflect "overwhelming" activity in the market on IBM's part. *Id.* at 1611.

AMI relies on *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir.1945) to support its exclusion of leasing companies from the relevant market. *See* A.R.M. at 79–86. In *Alcoa,* upon consideration of the defendant company's market position over a period of years and based on the conclusion that the production of "secondary" ingot was as much within Alcoa's control as the production of the "virgin" ingot from which it was derived, the Court decided to disregard "secondary" competition in its calculation of Alcoa's market share. 148 F.2d at 425. Unlike the situation in *Alcoa,* there is evidence in this case that leasing companies, which also lease non-IBM equipment, effectively compete with IBM and constrain IBM's ability to set prices or exclude competition in the market for new large scale main frame computers. *See e.g.,* A.P.F. ¶ 29 and the evidence cited therein. Leasing companies, therefore, properly belong in the relevant market applicable to this litigation. *See ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423, 428 (N.D.Cal.1978), *aff'd sub nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981) ("Memorex II").[27]

b.

As shown below, AMI also improperly excluded from its relevant market definition other products and services which offer potential buyers reasonable and viable alternatives to the purchase (or leasing) of large scale mainframe computers or upgrades to such computers. Their availability in the marketplace constrains IBM's power to command noncompetitively high prices and restricts IBM's ability to impose unwanted or burdensome terms on an appreciable number of buyers interested in acquiring computer systems or enhancing the performance of existing computer systems. These alternatives also pressure IBM to keep up with the market's growing technological demands. *See e.g.,* Phillips, Tr. 1585.

Thus, AMI incorrectly excluded many smaller capacity computers manufactured both by companies which do and companies which do not also manufacture large scale mainframe computers as defined by AMI. *See* Levin, Tr. 796–800. AMI excludes these products from the relevant market in part because the IDC report on which Prof. Levin relied did not classify them as large scale mainframes, and in part because AMI contends that there is only limited evidence of substitutability between these smaller computers and large scale mainframes. *Id.,* at 759–60, 782. For purposes of this action, the reliability of the IDC report is suspect. *See supra.* p. 271. The evidence shows sufficient competition between the smaller computers and large scale mainframes to require their inclusion in the relevant market.

At trial, marketing executives and users of complex computer systems acknowledged a trend toward "distributed data processing", in which smaller capacity computers are used in conjunction with or in place of large scale mainframes. Mr. Quinlan, President of IBM's North Central Marketing Division, discussed the increasing phenomenon, perhaps beginning in the 1970's, of "hierarchal systems" and "distributed

---

**26.** Prof. Levin also has measured market shares on a transaction basis, Levin, Tr. 842–45, which appears to be an acceptable measurement standard. *See* DX 1665 p. 3.

**27.** Even if leasing companies were to be excluded from the relevant market definition, so that IBM's market share would not decline accordingly, the significant constraints they impose on IBM's market behavior must enter into any proper assessment of the significance of IBM's market share. *See In re IBM Peripheral EDP Devices Antitrust Litigation,* 481 F.Supp. 965, 979 (N.D.Cal.1979), *aff'd sub nom. Transamerica Computer Co. v. IBM Corp.,* 698 F.2d 1377 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

systems" involving combinations of large computers, smaller computers, and terminals. Quinlan, Tr. 1043–44. Such systems provide alternatives to the acquisition of large scale main frames, as the situation involving J.C. Penney illustrates. *Id.* He also referred to instances in which the smaller computers (which, in fact, tend to be quite large) are "clustered" to look like and perform functions comparable to those performed by IBM's large scale mainframes. He referred to numerous instances (e.g., involving DuPont Research and Carrier Corporation) in which the smaller computers (excluded from AMI's market) competed successfully against IBM large scale mainframes. *Id.* at 1050–53, 1058–59; *see* DX 2201. Mr. Armstrong, IBM's Senior Vice President and Director General of IBM Europe, gave several examples of such competition, including the New York Stock Exchange's replacement of its IBM System 360 Model 50 computer (included in AMI's market) with over 200 Tandem "minicomputers" (excluded from AMI's market). Armstrong, Tr. 897–98. An executive of Core States Financial Corporation testified that his company moved away from using IBM large scale mainframes for at least one application, and opted for a system of multiple computers manufactured by Tamden and not included in AMI's market. Shah, Tr. 1516–20. A Hewlett Packard executive stated that his company's HP 3000 product line of computers (excluded from AMI's market) competes with IBM 308X computers in part because of a trend toward decentralized processing. Ikezoye, Dep. Tr. 4–6. An NCR official expressed a similar view. Nielson, Dep. Tr. 4–5; *see* English, Tr. 1557, 1565 (illustration of trend toward decentralized processing, involving Federal Mogul Corporation); DX 1786. A study entitled "Long Range Computing Strategy Report" prepared for Kent State University by Peat, Marwick, Mitchell and Company in 1984 discussed the "trend away from older, large single processing systems ... towards systems based on large number of small processors with local intelligence, linked by communications." DX 360, pp. 4–5, 49–52. Kent State's Director of Informations Systems testified that Kent State ultimately replaced a Burroughs model 6812 computer (included in AMI's market) with an IBM 3081D, but not without seriously considering purchasing a system of clustered DEC VAX 11/785 computers (excluded from AMI's market). McKinley, Tr. 1487–90, 1494–90.

There were many instances in which systems of smaller computers provided alternatives to large scale mainframe computers; the instances involved wide-ranging computer applications in different commercial settings. Such competition cannot be considered marginal. IBM considered the competition significant. In 1975, it reviewed one hundred of IBM's largest accounts and concluded that a significant number of customers, "almost two-thirds, were concluding to off-load their systems, their large systems to competitive distributed processing systems," Armstrong, Tr. 887–94; DX 1632, none of which are included in AMI's market. Prof. Levin's assertion that such competition is limited and therefore excludable from the market is unsupported by the record.

The same is true with respect to fault tolerant processing, in which smaller capacity computers are used essentially in parallel to ensure continuous processing capability for applications frequently performed by large scale mainframes. AMI excludes fault tolerant computers from its relevant market on the theory that they occupy a "specialized market nitch." *See* A.P.F. at ¶ 269; Levin, Tr. 802. The weight of the evidence, however, was to the contrary and compels their inclusion in the market. *See* Shah, Tr. 1517–21, 1524, 1530; Quinlan, Tr. 1055–56, 1059–63.

c.

AMI's relevant market also improperly fails to include peripheral products such as storage devices, input/output devices, disk drives or disk tapes. Storage devices store data for later access by the central processing unit (CPU). Input devices feed data to the CPU; output devices receive or accept data from the CPU. Disk drives and desk tapes may perform all three functions.

AMI acknowledges that "[e]xternal data storage devices are in a limited sense technological substitutes for the internal memory of a large scale mainframe." A.P.F. at ¶ 278. AMI excludes storage devices from the relevant market in part because it contends that they are not economic substitutes in the sense that their prices constrain the pricing power of a hypothetical monopolist of large scale mainframes. Levin, Tr. 761–62. AMI takes substantially the same position with respect to computer software, the programs that enable computer systems to function and perform a variety of tasks, A.P.F. at ¶ 279, which AMI excludes from the market. AMI's assertions are inconsistent with the evidence. Mr. Beckwith, IBM's Director of Service, testified that IBM always considers the peripheral products offered by competitors when IBM arrives at a "competitive price" for its computers. Beckwith, Tr. 1279–83. Input/output devices particularly are among the various "components" IBM examines to determine the price of its products. *Id.* Competitive software offerings also influenced IBM pricing decisions, Beckwith, Tr. 1279–83, and at least one computer user testified concerning the "trade offs" between software and hardware. McKinley, Tr. 1493.

There is a more fundamental reason for including peripheral products and software (systems software and application software) in the relevant market than the fact that they constrain IBM's pricing decisions with respect to large scale mainframes. As discussed below, peripheral products and software provided significant and reasonable alternatives to a wide variety of upgrades and modifications of large scale mainframes. *See, e.g.,* Staire, Dep. Tr. 19–20; Armstrong, Tr. 876–78. Other such alternatives which AMI's market definition also failed to take into account include smaller computers used to offload applications from large scale mainframes (including computers smaller than those previously discussed); devices for adding memory, speed, or capacity to processors; and computer service bureaus, which are companies providing data processing services to others. Further, AMI's market definition, to the extent that it includes upgrades at all, appears limited to MIPS upgrades. A.P.F. at ¶ 291. Such a limitation also is unwarranted and inconsistent with the evidence.

According to Charles I. Staire, Consultant to B.F. Goodrich, there are "many different ways," to enhance the performance capabilities of a computer system. Staire, Dep. Tr. 3–4, 19–20. Mr. Armstrong testified that a buyer interested in increasing the capacity of a computer system will consider "all of [the] elements that make up the computer systems in order to determine what is the most efficient way, most economical way to solve his problem." Armstrong, Tr. 876–78. Among the possibilities are increases in the computer's memory capacity and channel speed, and improvements in the computer software or peripheral devices like disk drives or disk tapes. *Id.* Mr. McKinley of Kent State added disk storage and main memory components as an alternative to upgrading the CPU of a 3081D computer. McKinley, Tr. 1500–01. Bipin Shah of Core States Financial Corporation postponed an upgrade or the purchase of a larger computer by improving "inefficiencies in the software," in communications, and in disk drive utilization. Shah, Tr. 1523. Thomas English of Federal Mogul testified that his company has "upgraded the CPUs from one model to the next, but usually before [the company] get[s] to that it's a memory upgrade, it is adding channels, it is adding other I/O [input/output] devices, disk, tape, so forth." English, Tr. 1565–66. Gary Smith of CMI testified that alternatives to upgrading a computer, in the sense of adding a MIPS upgrade, include replacing the computer, adding a second computer, adding additional memory, adding additional I/O devices, and off-loading work to other computer systems including those operated by service bureaus. Smith, Tr. 605–06. Robert Van Hellemont of Thomson McKinnon Securities stated that, "[r]ather than upgrading," a user can "add increased memory," add "increased discs or tape storage," offload "application to service [bureaus]", or offload "applications onto some number of other smaller computer systems." Van

Hellemont, Dep. Tr. 7, 76–79. Numerous other witnesses testified similarly. Harry Myland, one of the founders of AMI, acknowledged that a user "has a variety of options" to upgrading a CPU, including "memory upgrades or feature designs," "channel adds," and "internal speed improvements." Myland, Dep. Tr. 62, 187. Such components, enhancements, and available services permit users at least to postpone buying upgrades of CPUs or larger (new or used) computers for a significant period of time. Phillips, Tr. 1587. A market definition which ignores such competition is unrealistic.

d.

A box swap, which typically refers to the purchase of a new machine and the sale of an old one, is the "functional" and physical equivalent of an upgrade. *See* Levin, Tr. 170–72, 766. Box swaps can also be performed with used machines; for example, with machines owned by leasing companies. Allen, Dep. Tr. 59–60; Myland, Dep. Tr. 189–90; Van Hellemont, Dep. Tr. 76–77. Users seek box swaps or upgrades at roughly the same time in the life cycles of computers actually in place. *See* Lewis, Tr. 1718–19, 1727–28. Although AMI has shown that a box swap is not an alternative to a 3081K to 8084Q upgrade, box swaps are viable alternatives to most MIPs upgrades and should therefore be included in the relevant market definition.[28]

e.

Upgrades using parts provided by the customer, or by a leasing company from a machine of one of its lessees, also provide computer users with important alternatives to new upgrades or new machines. *See* Levin, Tr. 744–45. At his deposition, Mr. Allen acknowledged that the existence of 308X donor parts impacted on a user's decision to purchase new upgrades from IBM. Allen, Dep. Tr. 964. As with box swaps,

upgrades using parts taken from other machines may yield physically and functionally identical results to the purchases of new upgrades. Levin, Tr. 171, 182–83. The viability of used-parts upgrades as an alternative to upgrades performed with new parts may be limited, in practical terms, by the relative scarcity of necessary used parts, especially those needed for MIPs upgrades. Levin, Tr. 110–12; Allen, Tr. 339–40. However, the evidence does not support their total exclusion.[29] *See, e.g.,* Levin, Tr. 182–83. For example, between 1983 and 1986, AMI performed 237 (out of 244) 308X memory upgrades or downgrades, and 137 (out of 138) 308X channel upgrades or downgrades, with parts removed from and reinstalled on existing equipment. *See* DX 1363, pp. 8792–94, 9276–78; 8977; DX 1894D; DX 1894 B; DX 1894C; DX 1363, pp. 8543–44; DX 1895C. CMI also goes into the "user community" to purchase "memory, features, machines, and upgrades". Loria, Dep. Tr. 228–29; *see also* Nolin, Dep. Tr. 85–86 (AMI); LaRocca, Tr. 1165–67 (UCS).

f.

IBM's market share declines steeply from the figure suggested by AMI if the relevant market definition is expanded, as the evidence requires, to include (at least to some extent) leasing companies, smaller capacity computers, peripheral products (storage devices, input-output devices, etc.), memory upgrades, channel upgrades, software, and service bureaus. Prof. Phillips, IBM's market expert, while not attempting to measure IBM's share of a strictly defined market, *see* Phillips, Tr. 1594–95, established that IBM accounted for: 20.3 percent of the "value of shipments of [electronic data processing] products worldwide from U.S. plants plus software and service revenues"; 30.8 percent of 1984–1985

---

**28.** Prof. Levin acknowledged that box swaps can under certain circumstances be alternatives to upgrades, Levin, Tr. 182, and appeared to include box swaps in the relevant market. Levin, Tr. 766. *But see Id.* at 743–49. AMI excludes box swaps.

**29.** Including used-part upgrades and service bureaus, and to a lesser extent, box swaps, in the

relevant market may raise analytical problems similar to those involved in the decision to include leasing companies in the market. *See In re IBM Peripheral EDP Devices,* 481 F.Supp. at 979. As with leasing companies, I find that a meaningful market analysis must take these alternatives into account, whether or not they are included in the relevant market definition.

"shipments of general purpose digital computers with the unit value" exceeding $250,000 (recorded at FOB platform; the actual installed retail price of such computers exceeded $1 million); and 32.2 percent of the "data processing revenues from the top one hundred firms who [had] data processing revenue" for 1984 and 1985.[30] Phillips, Tr. 1596–1600; DX 1749, DX 1751; DX 1753. AMI did not attempt to measure IBM's share of any market other than the untenably narrow relevant market it advanced at trial. Although market share is but one measure of a firm's economic power and should be considered in light of other market factors, it seems clear that market shares in the range suggested by Prof. Phillips do not support a finding that a company possesses sufficient economic power to apply the *per se* rule against tying arrangements. *E.g., Hyde*, 466 U.S. at 26–27 & n. 43, 104 S.Ct. at 1565–66 & n. 43 (30 percent share in market for tying product not enough to constitute market power); *Times Picayune*, 345 U.S. at 611–13, 73 S.Ct. at 881–83 (30 to 40 percent not enough); *Ball Memorial Hosp., Inc. v. Mutual Hospital Ins. Inc.*, 784 F.2d 1325, 1330–31, 1334–37 (7th Cir.1986) (over 50 percent not enough).

2.

■ The analysis so far has focused on what may be described as demand substitutability or cross-elasticity. A thorough analysis of a firm's economic power also takes into account such considerations as: supply substitutability; other aspects of market structure, general market perform-

ance; and the market performance of the defendant company. An examination of important market and industry characteristics further supports the conclusion that IBM lacks the requisite economic power.

■ The absence of significant entry barriers in a given market or industry suggests that firms operating in the market or industry lack market power, even when they enjoy appreciable market shares. *See, e.g. United States v. Waste Management, Inc.*, 743 F.2d 976, 983–84 (2d Cir. 1984); *Ball Memorial Hosp.*, 784 F.2d at 1335.[31] Conversely, "[t]he greater the barriers faced by a new entrant, the more probable it is that control of a particular market share would enable defendant to exercise monopoly power."[32] *In re IBM Peripheral*, 481 F.Supp. at 976 (footnote omitted). The evidence established substantial entry[33] and growth of competition in the data processing industry embraced by the correctly defined relevant market.

A number of companies other than IBM manufacture a wide range of computers having the processing power of IBM large scale mainframe computers. Several of these (including Digital Equipment Corporation, Data General, Hewlett Packard, Tandem, and NCR) were admittedly excluded from the report upon which Prof. Levin relied to determine what constitute large scale mainframes. *See* Levin, Tr. 786–87, 789; 796–800. AMI has not offered evidence of the market shares any of these individual competitors enjoy.

30. Prof. Phillips' figures tend to understate IBM's market share to the extent that he includes competition from maintenance companies, which IBM contends belong in the relevant market, I.P.F. at ¶ 103, and AMI correctly excludes. The figures tend to overstate IBM's market share to the extent that, in DX 1749, they fail to reflect revenues from leasing companies. *See* Phillips, Tr. 1597–98. Prof. Phillips offered no opinion concerning the proper definition of the relevant market. Phillips, Tr. 1584, 1594.

31. Prof. Phillips testified that "even if a firm had 100 percent of the market today, if there aren't any impediments to entry, that would effectively preclude that firm from having market pow-

er." Phillips, Tr. 1577–78. I do not need to evaluate this opinion.

32. I agree with AMI that "the capacity 'to force' [for purposes of invoking the *per se* rule against tying] does not require the existence of monopoly power in a defined relevant market." A.M. at 36; *see supra*, p. 270. The market and industry characteristics I examine here are indicia of market power in general, not just monopoly power. *See, e.g.*, Phillips, Tr. 1577–1600.

33. There is evidence of firms departing the market as well, in part reflecting the rapid technological developments taking place in the market: "As [technology] provides a new opportunity, it usually forecloses an old one." Phillips, Tr. 1581–82.

The number of computer leasing companies competing with IBM in the market for large scale mainframes has grown during recent years. Kenneth Pontikes, a founder of Comdisco, one of the world's largest leasing companies,[34] Robertson, Tr. 707, testified that there were over 500 leasing companies in operation in 1986, Pontikes, Dep. Tr. 17, up from only about a "handful" in 1970. *See* DX 2168, p. 7. The comparable growth of the Computer Dealers and Lessors Association supports Mr. Pontikes' assertion. *See* DX 2168, p. 7; LaRocca, Tr. 1207. Comdisco enjoyed considerable growth between fiscal years 1982 and 1986, when it reported a net profit of $79 million on revenues totaling $902 million (Comdisco reported net profits of $29 million on revenues of $415 million for fiscal year 1982). Pontikes, Dep. Tr. 6–7. CMI, another major leasing company, reported revenues of $140 million for 1982, and $284.7 million for 1985. DX 1073, p., 4; DX 2168, p. 21; Smith, Dep. Tr. 187–88; DX 1071 p. 6.

■ The number of companies, like AMI, engaged in the business of converting and modifying computer equipment also has grown in recent years. AMI itself illustrates the relative ease of entry into the field. It was formed in 1973 with an initial investment of $1,500. Allen, Dep. Tr. 216–18; Ade, Dep. Tr. 92; Myland, Dep. Tr. 4, 63. AMI reported earnings of $15 million for the period 1973 to 1981, and over $53 million in the time period covered by the complaint. *See* DX 1821A. In 1984, AMI employed approximately 30 "field engineers",[35] DX 1922, and declined an acquisition offer by CMI for $20–$30 million. Myland, Dep. Tr. 440–46. UCS, which engaged in the conversion and modification of computer equipment, was founded in 1972 by five persons and an initial capitalization of a "couple [of] thousand dollars." LaRocca, Tr. 1161–64, 1168–75. In 1985, TRW, Inc. acquired UCS for $7.5 million up front plus a contingency payment estimated in excess of $3 million over a three-year period. *Id.* at 1177–79. UCS's business experienced its greatest growth and success during the time period covered by AMI's complaint.[36] *Id.; see also* Harnett, Tr. 1750–51.

3.

■ The characteristics of the data processing industry and IBM's market performance also undermine AMI's contention that IBM possesses the economic power necessary to impose *per se* liability. Technological progress or innovation in an industry generally reflects the presence of economic competition in the market, and is generally inconsistent with the wielding of undue economic power by a firm or group of firms in the industry. *See, e.g., Greyhound Computer Corp. v. IBM Corp.*, 559 F.2d 488, 497 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). The data processing industry has enjoyed impressive technological growth in recent years. "[E]normous technological change in computer hardware has occurred in recent years ... and customers are now able to obtain substantially increased computer power at less cost than was ever possible before." DX 360, p. 10; *see also*, DX 380, p. 21. In a 1986 report, Burroughs, a company which competes with IBM, *see* A.P.F. at ¶ 283, characterized the "information systems industry" as "highly competitive" and observed that competition

---

**34.** In terms of IBM list price, Comdisco owns approximately $7 billion in IBM equipment. Pontikes, Dep. Tr. 11. Comdisco has a larger inventory of 308X computers than it ever had of 303X computers. *Id.*

**35.** The level of employee skill required for a firm to compete successfully is a relevant entry barrier consideration. *See In re IBM Peripheral EDP Devices*, 481 F.Supp. at 976. According to Mr. Chisholm of AMI, anyone capable of doing "field-engineering" type work is capable of doing "installation, discontinuance, upgrades and refurbishment." Chisholm, Dep. Tr. 44. Mr. Myland of AMI testified that "[a]nyone with a knowledge a little over basic doorbell circuitry ... can do feature enhancement, modification, and additions on IBM equipment." Myland, Dep. Tr. 59.

**36.** A survey conducted on IBM's behalf concluded that the number of companies engaged in "conversion, upgrade, downgrade activity" grew from 10 in 1970 to nearly 100 in 1985. *See* Phillips, Tr. 1589.

in recent years has "intensified as the members of the industry, including many new competitors, have increased the number of products offered." PX 188, p. 5.[37] Control Data Corporation, which also competes with IBM, *see* A.P.F. at ¶ 281, reported in 1986 that "[t]he market for general purpose electronic digital computer systems [was] highly competitive," PX 245, p. 3, and that "[r]apid technological change in the computer industry [had] intensified in recent years as a result of shortened product life cycles and increasing foreign and domestic competition." *Id.* at 5.

IBM has contributed greatly to the rapid rate of technological innovation in the industry. Prof. Levin acknowledged that "IBM's success in the data processing industry is attributable in part to its role as one of the leading innovators in [the] economy." Levin, Tr. 866. IBM's development of the TCM technology central to this litigation provides a good illustration. IBM spent over a billion dollars and over one thousand man-years of labor to develop the TCM and TCM board.[38] Toole, Tr. 1008. As Prof. William J. Baumol, who testified as an expert economist for IBM, said, IBM's development of the TCM technology was "forced by market pressures, which were demanding quicker, easier, simpler, more reliable installation, which competitors were approximating at the very same

time and which IBM was forced to do." Baumol, Tr. 1658–59.

IBM's price/performance improvement record also reflects the presence of strong competitive forces in the relevant market. In 1952, IBM announced its 701 computer, which had a price-performance measurement of .02 MIPs per $1,000,000. In 1981, IBM announced its 3081K, which employed TCM technology and had a price/performance ratio of 3.1 MIPS per $1,000,000—an increase of over 1500 percent. Granito, Tr. 939–40; DX 1793; *see also* DX 2021. The 3081K computer represented an increase of more than 120 percent over IBM's 303U computer, announced four years earlier. *See* DX 1793. Further, IBM's computers were priced with sensitivity toward the "competitive environment" in which the company operated. Ross, Tr. 1364, 1390–91 Prof. Levin acknowledged that one measure of market power is a firm's ability "to move the price [of its products] around without constraint from products outside the market."[39] Levin, Tr. 781–82. IBM lacked such power.

4.

AMI's contention that IBM possesses sufficient power to justify *per se* condemnation of IBM's net pricing policy relies heavily on the asserted "uniqueness" of the TCM technology incorporated into the 308X (and 3090) product line.[40] Even

---

**37.** While recognizing the presence of competition in the industry, Burroughs described IBM as the "dominant competitor". *Id.*

**38.** IBM's research and development expenditures for 1982–1985 totalled $15.5 billion and consumed approximately 9 percent of IBM's gross income over that period of time. DX 1924.

**39.** Prof. Levin asserted that another measure of a firm's market power is its rate of return, measured on a stock market valuation basis. Levin, Tr. 860–61. Courts have relied on evidence of a defendant's profit record on the theory that persistent excess profits are inconsistent with market competition. *See, e.g., duPont,* 351 U.S. at 404, 76 S.Ct. at 1012. The evidence concerning IBM's rate of return on stock to stockholders does not warrant the conclusion that IBM possesses market power. *Compare* DX 1215 (IBM) *with* DX 1352 (AMI).

**40.** AMI also relies on the fact that large numbers of customers have accepted the tie. *See*

A.M. at 40. This argument requires proof that, at least as to an appreciable number of buyers in the relevant market, net pricing imposed an unwanted or burdensome condition of sale. *See Fortner I,* 344 U.S. at 503–04, 89 S.Ct. at 1259–60. As AMI acknowledges, the argument also requires evidence that "no factor other than the economic power of the seller explains this acceptance." A.M. at 35; *see Fortner II,* 429 U.S. at 618 n. 10, 97 S.Ct. at 867 n. 10; *see also Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1225 (3d Cir.) *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976) (proof of acceptance of a burdensome or uneconomic offer of a "tied" product is some evidence of coercion, but such proof alone does not establish, prima facie, the coercion element of a tying claim.) Accepting the continued viability of the reasoning in *Fortner I,* AMI's argument fails for lack of evidentiary support, as is discussed below. *See infra* pp. 291–292.

absent a showing of market dominance, the requisite economic power may, under special circumstances, be inferred from the desirability or uniqueness of the tying product. *See, e.g., United States v. Loew's,* 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962).

IBM obtained a patent for its TCM technology in 1976. PX 598; Granito, Tr. 978–79. TCMs are the "building blocks" or "brains" of the 308X and 3090 computers. Pontikes, Dep. Tr. 29–30; Allen, Dep. Tr. 373–75. They are the critical components of the computer hardware needed to perform 308X upgrades (especially MIPs upgrades); that is, they are the critical components of the alleged tying product. According to AMI, "[t]he uniqueness and sufficiency of economic power of the tying product, parts (TCMs) for net priced 308X MIPS upgrades, are independently established by the existence of patented TCM technology." A.M. at 40.

 Contrary to AMI's assertion, neither the uniqueness of a product nor the fact that it is patented alone establishes the requisite economic power. *Hyde,* 466 U.S. at 37 n. 7, 104 S.Ct. at 1571 n. 7 (O'Connor, J., concurring) ("A common misconception has been that a patent or copyright, a high market share, or a unique product that competitors are not able to offer suffices to demonstrate market power.") At least one Court has rejected "any absolute presumption of market power for copyright or patented product...."[41] *A.I. Root Co. v. Computer Dynamics, Inc.,* 806 F.2d 673, 676 (6th Cir.1986). *But see Digidyne Corp. v. Data General Corp.,* 734 F.2d 1336, 1340 n. 4 (9th Cir.1984) ("[W]hen the tying product is patented or copyrighted ... sufficiency of economic power is pre-

sumed."), *cert. denied,* 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985).[42] "[A] patent holder has no market power in any relevant sense if there are close substitutes for the patented product." *Hyde,* 466 U.S. at 37 n. 7, 104 S.Ct. at 1571 n. 7 (O'Connor, J., concurring); *see also Northern Pacific,* 356 U.S. at 10 n. 8, 78 S.Ct. at 520 n. 8 ("Of course it is common knowledge that a patent does not always confer a monopoly over a particular commodity.") Similarly, one Court has held that "factual uniqueness" is insufficient as a matter of law to establish market power. *Will,* 776 F.2d at 672; *accord, Fortner I,* 394 U.S. at 505 n. 2, 89 S.Ct. at 1259 n. 2 ("Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves."); *see also Fortner II,* 429 U.S. at 620–21, 97 S.Ct. at 867–68 (the kind of uniqueness considered relevant in tying product cases requires proof that the seller possesses some special "advantage not shared by his competitors"). If competitors can design and offer a package similar to defendant's product for a similar cost, there is no barrier and no market power, and hence no special advantage for purposes of establishing "uniqueness". *Will,* 776 F.2d at 673.

 IBM freely licenses its TCM patent. *See* Granito, Tr. 987. Further, the great majority of TCM's are owned and controlled by the leasing companies, which compete with IBM and which own 90 percent of all 308X machines sold by IBM. *See* DX 1847; PX 25. AMI and other companies engaged in the business of upgrading IBM 308X computers use TCMs owned by the leasing companies to perform conversion and modifications. Companies

---

**41.** At most, a patent is prima facie evidence of the necessary market power. *See Times–Picayune,* 345 U.S. at 611 n. 30, 73 S.Ct. at 882 n. 30, quoting *Standard Oil Co. of Cal. v. United States,* 337 U.S. 293, 307, 69 S.Ct. 1051, 1059, 93 L.Ed. 1371 (1949). *But see Hyde* 466 U.S. at 37 n. 7, 104 S.Ct. at 1571 n. 7. Countervailing evidence must be considered.

**42.** The court in *Digidyne* also stated that the requisite economic power may be inferred from the tying product's uniqueness, and that, there-

fore, "it should seldom be necessary in a tie-in sale case [involving a unique product] to embark upon a full-scale factual inquiry into the scope of the relevant market for the tying product and into the corollary problem of the seller's percentage share in that market." *Id. Digidyne* has been criticized on several grounds, *see e.g., Data General Corp. v. Digidyne Corp.,* 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (White, J., dissenting from denial of certiorari); *Will,* 776 F.2d at 673 n. 4, and I decline to follow it.

such as Amdahl, Burroughs, Cray, CDC, and others, which AMI acknowledges compete with IBM in its narrowly defined market for large scale mainframe computers, *see, e.g.*, A.P.F. at ¶¶ 273–64, presumably manufacture computer parts comparable to IBM's TCMs in terms of price and processing power. Even if no such comparable products exist, AMI has not shown that IBM's competitors are somehow prevented from developing products to rival the TCM.

I conclude that the factual uniqueness of IBM's TCMs, which admittedly represent a major technological advance and reflect the increasing demand for technological innovation in the data processing industry, does not warrant an inference that IBM possesses sufficient economic power to impose *per se* liability. The inference of market power is especially unwarranted where IBM's share of the relevant market is not exceptionally high and other market factors suggest the presence of economic competition in the field.

B.

■ "[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). AMI also seeks to establish the requisite economic power by reference to a relevant submarket comprised of the parts and services required for the conversion and upgrade of large-scale mainframe computers.[43] A.P.F. at ¶ 285.

■ The boundaries of a relevant submarket "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524. The evidence precludes a finding that parts and services required for the conversion and upgrade of large mainframes constitute a submarket distinct from the market consisting of large scale mainframe computers.[44]

There was considerable evidence of competition between, and cross-elasticity of demand for, upgrades and a variety of products, including the large scale mainframes themselves. *See supra* pp. 271–277. For example, Mr. Chisholm of AMI acknowledged that, "[a]s a general matter, a new box is an alternative to an upgrade...." Chisholm, Dep. Tr. 34. Upgrades and large scale mainframes are reasonable alternatives serving similar data processing needs. The price-sensitivity evidence is especially important.[45] Upgrade prices constrain the prices of new large scale processors; IBM set its net upgrade prices to equal the price differentials of its 308X computers so that customers would not buy one product at the exclusion of the other. *See e.g., supra* note 15; DX 1861; *see also* Levin, Tr. 163–64. Finally, IBM upgrades and mainframes are built at the same manufacturing plants and are gener-

---

**43.** AMI also refers to a submarket consisting of upgrades and modifications of IBM large scale mainframe computers. *See* A.M. at 57, 81. A submarket definition limited to IBM's own product line is untenable. Prof. Levin denied the existence of such a submarket. Levin, Tr. 772–74. Courts have generally rejected market definitions limited to the defendant's products. *See, e.g., Seidenstein v. National Medical Enterprises Inc.*, 769 F.2d 1100, 1106 (5th Cir.1985); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir.1984); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117–18 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1349 (3d Cir.1975). Further, the facts of this case do not support a conclusion contrary to the general rule, as my discussion of AMI's proffered submarket definition shows.

**44.** Prof. Levin failed to recognize a distinction between a market consisting of conversions and upgrades of large scale mainframes, and a market comprised of the large scale computers themselves. Levin, Tr. 774–76.

**45.** In *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 28 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) upon which AMI relies, evidence that price differentials did not significantly impact on customer preferences supported the argument that distinct submarkets existed.

ally installed by comparably skilled engineers.

AMI's evidence of IBM's economic power within the alleged submarket also is inadequate. AMI asserts that IBM possesses power in the relevant submarket because IBM performed 2,070 308X MIPs upgrades (of which 1,874 were net-priced), while AMI performed only 16 (of which 11 were equivalent to IBM net-priced upgrades). A.P.F. at ¶ 299; *see also* PX 465; Levin, Tr. 110–11. Were there proof of the existence of a relevant submarket consisting solely of upgrades and conversions, or especially of a submarket comprised exclusively of upgrades and conversions of IBM computers, then such evidence might support the inference of power AMI seeks to draw. However, AMI has failed to establish the existence of the prerequisite submarket.

## C.

There are separate grounds for concluding that *per se* condemnation of net pricing is unwarranted. The amount and value of labor involved in performing 308X MIPS upgrades is insignificant compared to the value of the requisite upgrade parts. As a result, AMI has not been foreclosed from a viable business opportunity by IBM's policy.

### 1.

A major design objective for the TCM and TCM board technology (the TCMs are plugged into the TCM board) was to enable alterations to 380X computers to be performed relatively quickly and with little labor. Granito, Tr. 925–27, 950, 979–81. There is ample evidence that IBM attained the desired result. The TCM technology allowed 308X upgrades to be performed considerably faster, with fewer parts involved, and with less risk of malfunctions than was possible with previous technologies, including the technology embodied in IBM's 303X product line. *See* Granito, Tr. 951–57; Brong, Dep. Tr. 80; Broomall, Dep. Tr. 68; Morrow, Dep. Tr. 163–65. For example, the labor required to add 1.1 MIPS to a 3033S processor (to convert it to a 3033N) was up to 20 times greater than the labor required to add 2 MIPS to a 3083E processor (to convert it to a 3083B). *See* Chisholm, Dep. Tr. 62–68; DX 1799.

The resulting and dramatic decline in the amount and value of labor required to perform 308X upgrades has redefined the niche in the computer market occupied by AMI. This decline has eliminated business opportunities once available. By itself, such a result does not offend the antitrust laws. The antitrust laws were enacted for "the protection of competition, not competitors." [46] *Brown Shoe*, 370 U.S. at 320, 82 S.Ct. at 1521. The value of the labor content of 308X MIPS upgrades is de minimus for antitrust purposes.

IBM's Director of Finance, Alan Ross, prepared a chart setting forth, among other things, IBM's calculations of the value of the labor content of all 308X MIPS upgrades performed during the years relevant to the complaint. *See* DX 1805A. Mr. Ross used 1985 MES prices and the 1985 hourly rate for field installation labor. Based on Mr. Ross's calculations, the value of the labor content of the upgrades averaged 1.2 percent of the net MES price. *See* DX 3001. With respect to all but the D to K upgrade, the value of the labor content equalled or was less than 1.2 percent of the net price of the MES. [47] *Id.*

At his deposition, Larry Allen, AMI's President, stated that if IBM sold the parts required for an E to B upgrade for $417,-600 (*i.e.*, at a price reflecting a reduction of $2,400 from the net MES price of $420,000, to account for the value of IBM labor not

---

**46.** *See also ILC Peripherals v. International Business Machines Corp. (Memorex I),* 448 F.Supp. 228, 233 (N.D.Cal.1978) ("Just as buggy whip manufacturers had to face the fact that the invention of the automobile meant the end of their market as they had known it, this new disk storage technology will have a serious impact on the market for customer-removable disk products. However, the antitrust laws were not

designed to insure the maintenance of the status quo for any competitor.")

**47.** The value of the labor content also exceeded 1.2 percent of the value of the net priced MES with respect to the CX to EX upgrade, *see* DX 3001, but the number of such upgrades performed (2) is insignificant.

provided), it would not present AMI with a viable opportunity to compete with IBM. Allen, Dep. Tr. 938–39; *see also* Allen, Tr. 371. AMI would not be able to compete with IBM if the value of the labor content of the E to B upgrade were .6 percent of the net MES price for the upgrade. *See also* Allen, Dep. Tr. 968–69 (B to K upgrade). Nor would AMI, according to Mr. Allen, be able to compete with IBM if the value of the labor content of a 308X MIPS upgrade equalled .9 percent of the net upgrade price. Allen, Dep. Tr. 968 (B to J upgrade); Allen, Tr. 372. Contrary to his deposition testimony, Mr. Allen stated at trial that the same parts prices and labor content figures would, in fact, present AMI with a viable business opportunity. *See* Allen, Tr. 369–372. I regard Mr. Allen's trial testimony on this subject as hyperbolic. I credit his deposition testimony, and not his trial testimony.

At trial, Mr. Allen also testified that AMI would be presented with a viable business opportunity if it were able to buy 308X MIPS upgrade parts from IBM without IBM labor included at prices reflecting a labor content value equal to 1.2 percent of the net MES price. Allen, Tr. 373–74. Mr. Allen's testimony contradicted his earlier statement that no service organization, including AMI, could survive on a 1.87 percent return on its investment in parts needed to perform upgrades. *See* DX 2066.[48] I do not credit Mr. Allen's testimony that AMI could survive on a 1.2 percent rate of return on its investment in upgrade parts. *See also infra* note 68. There was no other evidence that AMI could survive on such a rate of return.[49] If AMI were to buy the upgrade parts from IBM at IBM's "MES price without labor"[50] (*see* DX 1805A, Column 6), it would not, on the whole, be able to perform the upgrades and charge customers what IBM charges for the same upgrades on a net price basis and still recover what AMI would regard as an acceptable profit.[51]

Were IBM required to price and sell 308X upgrade parts and labor separately, it would not be required to sell the parts at a price lower than the difference between the MES net prices and Mr. Ross's figures for the value of the labor content of 308X upgrades, provided that Mr. Ross's calculations allow IBM to recover its direct and indirect labor costs, plus a reasonable profit.[52] IBM 308X upgrade parts sold at such prices would not present AMI with a viable

**48.** In July, 1984, during settlement discussions, AMI declined IBM's offer to sell AMI 308X upgrade parts without IBM labor included at prices below IBM's net MES prices. Mr. Allen wrote: "On 3081 quantities ordered on your contract as presented, AMI would spend over three million dollars. Our maximum return on this purchase would be $65,000. That makes a 1.87 percent return on our investment. I am quite confident that no service organization can survive on that profit margin." DX 2066; *see* Allen, Tr. 374–75. DX 2066 is admissible for impeachment purposes under Fed.R.Evid. 408. *See, e.g., Reichenbach v. Smith*, 528 F.2d 1072, 1075 (5th Cir.1976) ("Rule 408 codifies a trend in case law that permits cross-examination concerning a settlement for purpose of impeachment."); *Stainton v. Tarantino*, 637 F.Supp. 1051, 1080–82 (E.D.Pa.1986).

**49.** At his deposition, Mr. Allen asserted that he could not state what AMI would regard as an acceptable rate of return on its investment in parts. *See* Allen, Tr. 378–79.

**50.** Such prices are lower than IBM's net MES prices, against which Mr. Ross's labor content percentages are calculated. Thus, the figures in DX 1805A, Column 7, slightly understate what AMI's rate of return would be if it bought IBM parts at the SWRPQ price and installed upgrades at prices charged by IBM for net priced upgrades.

**51.** I reach this conclusion, and my final decision, without consideration of DX 2069 and AMI's response thereto. However, I note that, on October 10, 1985, AMI rejected IBM's settlement offer to sell AMI numerous net priced MESs without IBM labor included at prices consistent with Mr. Ross's calculations. *See* A.P.F. at ¶¶ 310, 312; DX 2069. Although Fed.R.Evid. 408 limits the admissibility of evidence of settlement discussions, AMI included the fact that it declined IBM's 1985 settlement offer in its Proposed Findings of Fact and, thus, may have waived any objection to its admissibility.

**52.** Prof. Levin acknowledged that, if IBM's labor content figures enable IBM to recover all costs associated with the properly defined service component of upgrades, plus a profit, then IBM would be under no obligation to set its prices at a level at which AMI could earn a profit. Levin, Tr. 218–19; *see also* Baumol, Tr. 1697; Ross, Tr. 1398–99.

business opportunity. Unless Mr. Ross's estimates are unduly low, AMI has not been forceclosed from a viable business opportunity as a result of net pricing.

AMI argues that "[t]he labor content of net priced MIPs upgrades, as estimated by IBM, is significantly understated," A.T.M. at 46, and that IBM's estimated value of the labor content is "unrealistically low." *Id.* at 47.[53] Of course, where two products are sold only as a package, it is difficult to ascertain the true cost of either. *See Hyde,* 466 U.S. at 15, 104 S.Ct. at 1559.

a.

Mr. Ross's figures are based on the pricing methodology that is used by IBM to determine its SWRPQ prices for memory and model upgrades. Ross, Tr. 1369, 1381–82; *see also* Granito, Tr. 984; Beckwith, Tr. 1284–96, 1298, 1358. IBM sells the J to K MIPS upgrade (which does not require the removal of TCMs) optionally on an SWRPQ basis at the price listed on Mr. Ross's chart. It is IBM's actual SWRPQ price. IBM used the same method to determine the value of the labor component of the other MESs which IBM sells only on a net priced basis. *See* Ross, Tr. 1881–82. Thus, although the calculations for upgrades other than the J to K upgrade were made for trial purposes, the methodology employed was not. As Mr. Ross's chart explains, the labor content of every MIPS upgrade is determined by: 1) taking the average installation hours for each upgrade from IBM's field service cost estimates; 2) multiplying those hours by the 1985 field installation rate for IBM labor; 3) adding 7 percent for travel time and 10 percent for contingency; and 4) subtracting $100 for

handling. *See* Ross, Tr. 1378–79, 1381–83, 1396–97; DX 1805A; DX 2215.

As AMI contends, IBM's figures underestimate the value of the alleged tied product because Mr. Ross's estimates account only for field installation labor. AMI's definition of the tied product includes all engineering labor required to perform the upgrade, including the engineering services performed prior to the installation of the upgrade. The fabrication work not taken into account by Mr. Ross's estimates includes planning (e.g., determining the computer's E.C. level)[54] and diagnostic work, and the revision of the (upgraded) computer's microcode.[55] Levin, Tr. 64–66. Fabrication work may require a different degree of skilled labor than is required by field installation work. *See* Gibson, Dep. Tr. 333–34; Beckwith, Tr. 1316–17.

Although the amount and quality of fabrication work needed to perform 308X upgrades is relatively small and considerably less than it was with respect to prior technologies as a result of the TCM technology and the automated Machine Level Control System, *see* Ross, Tr. 1384–85; Bigando, Tr. 1236–39; Granito, Tr. 961–62, 976–77; Beckwith, Tr. 1285, 1300–01, 1316–17, an adjustment must be made to Mr. Ross's figures to account for the work.[56] (I discuss the necessary adjustments below. *See infra* p. 287). Otherwise, and except for what AMI calls the "IBM test", which IBM does not do, IBM's estimate of the labor component of 308X upgrades, reflected in Mr. Ross's calculations, includes all the activities which AMI asserts are

---

**53.** AMI does not assert that IBM's labor component prices are "predatory"; *i.e.,* below cost. AMI suggests, however, that IBM transfers profits from its sale of the parts required to perform upgrades to its sale of the labor services involved. A.R.M. at 39. There is no evidence to support this assertion.

**54.** The EC (engineering change) level of a machine must be determined before building the upgrade. The EC levels of machines may differ even within the same model. *See* Allen, Tr. 251–52. IBM installs ECs at no charge to the customer. Granito, Tr. 963–65.

**55.** Microcode contains programs which support each configuration of a 308X computer and control various computer functions. Allen, Tr. 251–52; Zartler, Dep. Tr. 63. In order to reconfigure a 308X computer, it is necessary to modify the machine's microcode. *See* Allen, Tr. 251–53, 267–70. Such modification may involve the alteration of one to sixty microcode diskettes. *Id.* at 252–53, 268–69.

**56.** IBM argues that fabrication work, to the extent not already included in Mr. Ross's figures, is trivial; *see* IBM's Proposed Findings of Fact and Conclusions of Law at ¶ 260; however, I do not think that it can be overlooked.

necessary to perform the upgrade. *See* Beckwith, Tr. 1292–94.[57]

AMI also contends that the hourly rate contained in Mr. Ross's estimates understates the actual value of the labor ("installation" and "fabrication") required to perform upgrades, in part because the $165/hr rate reflects IBM's standard hourly rate for maintenance services (on a time and materials basis) and not the rate IBM used when it performed upgrades on an RPQ basis. A.M. at 47; *see* Lewis, Tr. 499–500. AMI ignores the fact that the hourly rate used by Mr. Ross was the rate actually used by IBM to determine the SWRPQ price of the J to K upgrade. Further, IBM uses the same customer engineers to perform upgrades as it uses to do maintenance work. Beckwith, Tr. 1284–96, 1298, 1358; Granito, Tr. 984. The $165/hr rate enables IBM to recover its labor costs plus a profit. Ross, Tr. 1381–82. The prices used by Mr. Ross are IBM's real prices for the services provided. *See* Beckwith, Tr. 1284–94.

AMI argues that IBM's $165/hr rate is significantly lower than the rate reflected by the prices AMI and IBM obtained for "reconfiguration" services using donor or customer-owned parts.[58] During the relevant years, AMI performed eleven upgrades equivalent to 308X MIPS upgrades using customer-owned parts, and received considerably more than $165/hr. *See* PX 466; Levin, Tr. 110–11. AMI's evidence that IBM charged and obtained upgrade prices reflecting hourly labor rates greater than Mr. Ross's estimates, however, is unpersuasive.[59]

AMI asserts that IBM would have charged Comdisco $50,000 to perform a "Q-split", making IBM's effective hourly rate $1000. A.P.F. at ¶ 156; *see* Lewis, Tr. 1714–15; *see also* DX 2268; DX 1579. IBM's hours to perform a Q-split are 50.6. *See* DX 1579. A "Q-split" involves separating an IBM Q mainframe into two model 3081K computers operating independently. *See* DX 2268. There is no evidence that IBM performed the Q-split (AMI did it for $30,000), Lewis, Tr. 492–93, 1714–15, and a Q-split is not an upgrade. What IBM would charge for the labor component of a reconfiguration which is not a model upgrade is of little relevance to the issues in this litigation. *More importantly*, AMI's calculation of IBM's effective hourly rate incorrectly assumes that the $50,000 price reflected only IBM's labor charges; in fact, IBM's labor charges accounted for less than twenty percent of the total price. *See* DX 1579.

AMI also established that IBM requested $200,000 to perform a "Q to K/K to Q" reconfiguration for Comdisco, *see* Lewis, Tr. 1714–15, which AMI estimates requires 85.5 hours of engineering labor. *See* PX 447–68; Allen, Tr. 264–66. IBM estimates 105 hours. *See* DX 2281 at 2; DX 2282 at 2; DX 2283 at 2; DX 2284 at 2; DX 2268A (the exhibits show the FE hours involved in the requisite activities). Comdisco paid AMI $80,000 to do the "Q to K/K to Q" reconfiguration. Lewis, Tr. 1714–15. AMI implies, but does not assert, that IBM's hourly rate for services required to perform a "Q to K/K to Q" reconfiguration

---

**57.** IBM's estimates of the labor hours required to upgrade 308X computers are generally the same as AMI's, and in some cases exceed AMI's estimates—even though IBM does not include (and AMI does include) the time needed to perform what AMI describes as "IBM test" and "Determining Parts". *See* DX 1580 (especially, p. 90654); DX 1805; PX 447–58; PX 447–60; PX 447–62; PX 447–68; *see also* Chisholm, Dep. Tr. 62–67; *cf.* DX 1926.

**58.** AMI contends that this is the "best method" to determine the value of the allegedly tied engineering services, A.M. at 44, since it reflects customer demand. AMI argues that "[Mr.] Ross's estimates do not … reflect the value of

reconfiguration service in the marketplace." A.R.M. at 32. However, IBM's SWRPQ price for the J to K upgrade, which is based on a $165 hourly rate for installation labor, is IBM's actual competitive price in the market.

**59.** At best, AMI has shown that on several occasions it was able to perform the equivalent of IBM 308X MIPs upgrades while charging substantially more for its labor services than IBM. However, IBM showed that, based on AMI admissions (.9 rate of return and 3 percent inventory costs, *see infra*), AMI would have had no viable business opportunity even if it would have been able to command the higher prices and perform the upgrades. *See* DX 3000.

exceeds $2000. However, the $200,000 price quotation included the price of necessary parts; the effective hourly rate was about $200. *See* DX 1579 at 3; DX 2281 at 2; DX 2282 at 2; DX 2284 at 2; DX 2268A; DX 2279.

AMI also contends that Mr. Ross's estimates understate the true labor content of 308X MIPs upgrades because they "do not take account of the fact that a net priced MES sold by IBM includes the labor content of one year of warranty service." A.M. at 47. AMI's argument appears to be that the labor involved in performing 308X MIPS upgrades (previously defined as "installation" and "fabrication" labor) also includes the labor component of the warranty maintenance service provided with IBM net priced upgrades. Although AMI has relied on various definitions of the tied product during the course of litigation, *see supra* note 12, it never advanced such a definition prior to trial and cannot pursue it at this time. *Cf. Johnson v. Trueblood,* 629 F.2d 287, 294–95 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). Furthermore, AMI provided no evidence concerning the labor content of IBM's warranty maintenance service. The prices of IBM's maintenance agreements do not equal IBM's costs for providing the service.

The evidence compellingly showed that technological advances incorporated in the 308X computer system have reduced the amount of labor involved in performing 308X MIPs upgrades [60] to an amount which is insignificant and de minimus for antitrust purposes. With a modification to account for "fabrication" labor, I adopt Mr. Ross's estimates of the labor content of 308X MIPS upgrades. I also credit Mr. Ross's assertion that IBM's $165 hourly

rate for installation services allows it to recover its labor costs plus a reasonable profit. Therefore, were I to require IBM to sell the parts involved in such upgrades without IBM labor included, I would not require IBM to sell the parts at a price reflecting a greater reduction from IBM's current net price than that suggested by Mr. Ross's figures, after adjusting for fabrication work.[61]

b.

To reflect more accurately the amount (and quality) of the labor component of 308X MIPS upgrades as AMI has defined it, Mr. Ross's figures must be adjusted to include fabrication work. Prof. Levin testified that Mr. Ross's "installation" figures had to be adjusted by as much as 65 percent. *See* Levin, Tr. 105–09; *see also* PX 462; PX 463; PX 464; PX 416; PX 425. The evidence does not warrant such an increase.[62] Prof. Levin's estimates of the "fabrication" component of 308X MIPs upgrades relies on IBM prices for certain memory and channel upgrades performed by IBM with customer-owned parts between December 1983 and November 1984, from which AMI calculated the percentage of the total labor attributable to "fabrications and support (non-installation) activities." *See* A.P.F. at ¶ 168. Prof. Levin's estimates expressly include more than just fabrication activities and do not involve model (MIPS) upgrades. The reliability of the methodology and the figures, for purposes of calculating the fabrication component of 308X MIPS upgrades, is therefore suspect.

 Furthermore, the field engineering prices relied upon by Prof. Levin were "corrected" by IBM, *see* Ross, Tr. 1387–89, and made "more competitive" in 1984, be-

---

**60.** Although the focus has been on MIPS upgrades, my analysis applies to all 308X upgrades involving TCM technology. Half of all memory upgrades were net priced, but not all of them involved the TCM technology; some used the predecessor MST technology.

**61.** Nor would I require IBM to sell the necessary parts on an OTC basis at an aggregate price

lower than the price suggested by Mr. Ross's estimates, after adjusting for fabrication.

**62.** Even if Mr. Ross's figures were increased by 65 percent, AMI would not have a viable business opportunity if only a few of the expenses AMI would necessarily incur to perform the work were taken into account. *See* DX 3001;

fore this action was brought.[63] *See* PX 377 at 89707. Mr. Ross relied upon the corrected, "more competitive", and uncontested 1985 prices. *See* Ross, Tr. 1387–89; DX 2091; PX 410; PX 422; PX 464. Prof. Levin knew that IBM had changed the prices he used to arrive at the 65 percent adjustment figure, but made no attempt to adjust the figure to reflect IBM's corrected prices. Levin, Tr. 119–22, 125–28, 131–33. IBM did and, using Prof. Levin's methodology, determined that non-installation (including fabrication) services accounted for 11 (not 65) percent of the total labor involved in performing upgrades. *See* Ross, Tr. 1398–99; PX 410; PX 422; PX 464; DX 3001A. This is the most accurate estimate produced at trial and I adopt it. Mr. Ross's figures, which excluded the amount of labor represented by fabrication work, must therefore be increased by 11 percent to account for the total labor (as defined by AMI) involved in 308X MIPS upgrades.

c.

Using IBM's 1985 labor and MES prices, adjusting Mr. Ross's calculation of the labor component by 11 percent, and taking into account a few of the expenses (inventory and transportation costs) AMI would

incur if it performed all MIPS upgrades IBM performed during the relevant years,[64] one can assess the impact on AMI's business if IBM unbundled its sales of 308X MIPS upgrade parts and labor, and AMI bought the parts from IBM and acquired all of IBM's MIPS upgrade business.[65] AMI would lose over $35 million. *See* DX 3001A.[66]

AMI disputes IBM's assertion that AMI would always incur inventory holding costs of 3 percent of the upgrade purchase price.[67] A.R.M. at 36. The 3 percent figure is based on an interest rate of 12 percent and a holding period of 3 months. *See* PX 379, at 19, 21; Allen, Tr. 378. AMI's principal argument is that AMI would not incur such costs if AMI's major customers, the leasing companies, instead of AMI, purchased and stored the parts for subsequent use. A.R.M. at 37. AMI does not deny that it would incur inventory holding costs if it had to warehouse the parts itself. AMI stored 303X parts it acquired from IBM for subsequent installations, and incurred the 3 percent inventory carrying cost. Levin, Tr. 195, 199. Further, Mr. Allen stated that AMI would incur the 3 percent inventory cost if it "were permitted to compete in this market of [308X] net

DX 1927; *see also* Levin, Tr. 197–204; Ross, Tr. 1392–96.

63. AMI suggests that IBM's lower and "more competitive" SWRPQ installation labor price of $165/hr. was designed to prevent third party installation of IBM features bought on an SWRPQ basis. *See* A.R.M. at 35 n*. AMI relies on a 1983 memorandum by Mr. Gibson in which he states, "Since third parties see an opportunity here, we should re-examine the SWRPQ price," and "It appears the $221 effective rate is high and allows enough of an umbrella for a third party to install the MES." PX 151. The memorandum, however, refers to a 303X feature, not a 308X upgrade, *see id.,* and the effective hourly rate was not $221/hr, as Mr. Gibson assumed, but $161/hr. *See* PX 440 (stating that if the $161 hourly rate were to be modified, it should be increased to $186/hr.). Furthermore, absent proof of below-cost pricing, it would not be unlawful for IBM to "reexamine" its prices in order to compete more effectively.

64. Additional expenses which AMI would incur include: the increased labor costs required to perform the additional upgrades (this amount

would be large, *see* Houghton, Tr. 1453–56; Beckwith, Tr. 1302–03; Baumol, Tr. 1650–51; Ross, Tr. 1396; DX 1776A); additional expenses for marketing and inventory management; increased expenses for property, plant, and equipment; additional inventory insurance; and added interest expenses. *See* Houghton, Tr. 1453–56; Baumol, Tr. 1650–55; DX 1925.

65. If AMI took over only a portion of IBM's business, its revenues and expenses would be adjusted accordingly, and the impact on AMI's business would be proportionately the same.

66. The only way AMI could engage in the 308X upgrade business profitably, were the needed parts sold without IBM labor, would be if customers were willing to pay a substantial premium for AMI's services. The record does not support a finding that such a possibility exists. *See infra.* pp. 290–291.

67. AMI does not appear to contest IBM's assertion, which is supported by the record, that AMI would incur out of pocket travel expenses equivalent to $1,500 per transaction. *See* Levin, Tr. 203; PX 379, at 20–21.

priced MESs." Allen Tr. 377–78; *see also* DX 197 (AMI inventory of MESs it owned). I therefore conclude that it is appropriate to include such holding costs among AMI's expenses.

AMI's business prospects would not be greatly improved if its anticipated inventory costs were reduced from 3 percent to 2 percent (to reflect a shorter holding period) and actual IBM prices (rather than 1985 prices) for 308X upgrade labor and MESs (net-priced) for the period 1982 to 1986 are considered.[68] In such event, AMI would lose over $26 million.[69] *See* DX 3001B; Ross, Tr. 1400–01.

My conclusion that AMI has no viable business opportunity concerning 308X upgrades excludes from the analysis at least as many considerations favorable to IBM as to AMI. For example, I have not further adjusted Mr. Ross's figures concerning the value of the labor component of 308X upgrades to reflect an arguably greater level of skill that may be involved in fabrication work. *See supra* p. 283.[70] On the other hand, I have not included in my assessment of AMI's business opportunities a range of additional and evidently considerable expenses which AMI would incur proportionately to the amount of IBM upgrade business it took over. *See supra* note 64. These refinements would not change the fact that technological advancements have so reduced the amount of labor involved in performing 308X MIPS upgrades that it represents a relatively insignificant percent of the value of the associated hardware.

**2.**

*Per se* condemnation of a tying arrangement may be warranted when the seller possesses the degree or kind of market power that enables it to force customers to purchase a second product (which the buyer either does not want at all or would prefer to purchase elsewhere on different terms) in order to obtain the tying product. *Hyde*, 466 U.S. at 17–18, 104 S.Ct. at 1560–61. Proof of a *per se* unlawful tying arrangement requires proof of the existence of two separate and distinct products or services. I have already concluded that AMI has failed to show that IBM possesses the requisite economic power to force or coerce buyers. My findings that the value of the labor content of 308X MIPs upgrades is negligible and that IBM's net pricing has not precluded AMI from engaging in a viable business are relevant to the issue of the existence of two separate products.

"[W]hether one or two products are involved turns ... on the character of the demand for the two items." *Hyde*, 466 U.S. at 19, 104 S.Ct. at 1562; *see also, Will*, 776 F.2d at 671 n. 1 ("A tie involves products that may be sold in separate markets."). In this case, no unlawful tying arrangement can exist unless there is sufficient demand for the labor service involved in performing 308X upgrades, separate from the demand for the requisite parts, to identify a distinct product market in which it is efficient to offer the former separately from the latter. *See Hyde*, 466 U.S. at 21–22, 104 S.Ct. at 1563.

AMI has failed to establish the requisite separate demand for the services it defines as the tied product.[71] The evi-

---

**68.** If actual IBM prices for 308X labor and net priced MESs are used instead of Mr. Ross's original figures, which applied 1985 prices for both through the period 1982 to 1986, the average labor content of all MES upgrades would be .8 percent of the purchase price of the net priced MES, *see* DX 3001B; i.e., an amount lower than Mr. Ross's estimate of 1.2 percent, and lower than the .9 percent deemed unprofitable by AMI.

**69.** If actual prices during the 1982–1986 period are used, and the 3 percent inventory cost figure retained, AMI would lose over $48 million.

**70.** I relied on Prof. Levin's methodology, which made no distinction between the quality of installation and fabrication labor, but measured only the additional quantity of labor associated with fabrication work.

**71.** At trial, AMI counsel acknowledged that if the value of the labor content of 308X upgrades were de minimus, the two products would be considered a "single product": If that were the case, "[w]hat the customer really wants is the feature. He doesn't care about the installation." AMI Opening Statement, Tr. 10–12. AMI counsel stated that "$2400 out of a much larger cost for the feature" would be de minimus. *Id.*

dence is especially lacking with respect to end-users of 308X computers. Although some expressed an interest in having a choice among suppliers of upgrades, *see, e.g.,* Shah, Tr. 1529–30; English, Tr. at 1567–69, most expressed no interest in having 308X upgrade parts and labor provided separately. End-users tended to view the parts and labor as a single product. William E. McKinley, of Kent State University, testified that he was "very definitely not interested in having parts arrive from one source and installation arriving from another source." McKinley, Tr. 1503–04. Bipin Shah, of Core States Financial Corporation, testified that he did not "shop around for parts and labor." His company asks for a single "upgrade price, total, end to end ... [y]ou come in and do the whole job and you quote a price on that." Shah, Tr. 1526. Thomas English, of Federal Mogul Corporation, had no interest in separately acquiring the parts for upgrades and shopping around for installation services. English, Tr. 1566–67. Thomas Druding, Computer Configurations Specialist for City of Philadelphia, testified that he was not aware of any situation in which the City had requested separate prices for upgrade parts and installation. Druding, Dep. Tr. 9–11. First Pennsylvania Bank of Philadelphia purchased J to K upgrade parts (which IBM sells SWRPQ) from one source and used AMI to install the upgrade, but did not purchase the parts from IBM or another company which could also install the upgrade. Wilde, Dep. Tr. 26–34. David Ness, of TV Guide, testified that he was uncertain but thought he would be interested in purchasing 308X upgrade parts without the labor included if his company's technical staff had the skill to perform the upgrade. Ness, Tr. 1550.

Unlike end-users, leasing company witnesses expressed a desire for alternative sources of upgrade parts and labor. CMI Executive Vice President Gary Smith distinguished between the parts and labor involved in an upgrade, and said CMI wanted the option of having "IBM or ... somebody else do the work." Smith, Tr. 579. Melvin Lewis of Comdisco testified that Comdisco wanted IBM to price parts and labor separately.[72] Lewis, Tr. 478–79, 1717. Comdisco wished to have the choice of having AMI install upgrades using parts (features) purchased from IBM without IBM labor included because of the greater "flexibility" AMI provided. *See* Lewis, Tr. 456–57, 476–78, 480–82, 548–49. CMI also regarded AMI's relatively prompt reconfiguration service as important. *See* Smith, Tr. 581–82.

Although there was evidence of demand on the part of some leasing companies for separately-provided 308X upgrade labor, AMI failed to establish the existence of demand for such labor at the prices AMI would admittedly have to charge in order to provide the service. For AMI to engage in the business of providing 308X upgrade services (based on the schedule of upgrade parts prices IBM would be entitled to set), it would have to charge considerably more than IBM for essentially the same service.

There is insufficient evidence of demand for upgrade labor at prices AMI would have to charge to support a conclusion that a competitive market for 308X upgrade labor does or could exist. Leasing companies have purchased virtually no 308X model, memory, or channel upgrades without IBM labor included (in order, for instance, to have AMI install the upgrade) when such upgrades were available on an SWRPQ basis (which roughly equals the price IBM would be entitled to charge for its parts).[73] *See* DX 2265; DX 1063; DX 1584. Every J to K upgrade purchased by

---

That is the case involving the E to B 308X upgrade. *See* DX 1805A.

**72.** In the majority of instances when Comdisco sells an upgrade to an end user, it does not quote a separate price for the installation labor involved in the upgrade; it sells the user a "result that includes both the parts and the labor." Lewis, Tr. 502–03. CMI also generally charges its upgrade customers a single price for

the parts and the installation labor. Smith, Tr. 613–14; *see also,* Loria, Tr. 674–76. CMI's customers generally request a single price for the installed upgrade. Smith, Tr. 614.

**73.** The "MES Price(s) Without Labor" set forth in DX 1805 fail to deduct for installation labor and would have to be reduced accordingly.

CMI and Comdisco was bought with IBM installation service included even though IBM also sold the feature on an SWRPQ basis.[74] *See* Lewis, Tr. 1720; Smith, Dep. Tr. 130–33. AMI bought only two J to K upgrades from IBM (out of 142 such upgrades sold by IBM) on an SWRPQ basis between 1982 and 1985. Allen, Tr. 382. AMI installed only one of the two J to K upgrades; it used the parts of the second J to K upgrade to perform a B to J upgrade. *See* Allen, Dep. Tr. 1252, 1256–57; DX 79; DX 137; DX 1363, p. 8333. One of the reasons why AMI was uninterested in buying more SWRPQ J to K upgrades from IBM was the price. Allen, Tr. 374–75, 380–83; DX 1805; DX 1401 at 16–23, 42, 45, 56.

AMI produced evidence that Comdisco used AMI to install a number of MESs even though Comdisco had bought the MESs from IBM with IBM installation labor included. *See* Lewis, Tr. 545–46, 500–01. However, Mr. Lewis of Comdisco explained that he would use AMI installation service only if it were "lesser than, the same as, or in rare exceptions, only a slight premium above the prevailing IBM list price." Lewis, Tr. 549. Using an E to B upgrade as an example, Mr. Lewis testified that he would not regard an AMI hourly rate of $1500 for installation service as only slightly greater than an IBM hourly rate of $180 or $200.[75] Lewis, Tr. 1724. Mr. Smith of CMI testified that, other things being equal, he did not wish to pay 10, 20 or 30 times more than necessary to obtain installation service. Smith Tr. 607–09. When AMI performed a J to K upgrade for CMI with the J to K upgrade

parts AMI bought from IBM on an SWRPQ basis in 1984, it charged CMI the same price IBM would have charged for the installed upgrade; it did not charge a premium. *See* DX 55; DX 57; PX 1–y at 140, 836.

3.

■ The evidence that leasing companies would not select AMI's more expensive installation services if IBM unbundled the sale of 308X features and labor is relevant also to the issue of IBM's economic power. AMI sought to establish that IBM possesses the requisite market power to warrant *per se* condemnation by reference to the "substantial volume of purchases of unwanted IBM engineering service as a result of net pricing...." A.R.M. at 25. For example, AMI contends that, absent net pricing, Comdisco "would utilize AMI or other third party fabricators to fabricate and install a significant number of upgrades." A.P.F. at ¶ 106.

AMI's position requires proof that buyers considered the requirement of buying IBM labor a burdensome term of the 308X upgrade sales agreement and would not have purchased IBM's labor but for IBM's requirement that they do so. *See Northern Pacific*, 356 U.S. at 7–8, 78 S.Ct. at 519 ("The very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power, at least where, as here, no other explanation has been offered for the existence of these restraints."); *Fortner I*, 394 U.S. at 503–04, 89 S.Ct. at 1259. (The "concern is whether the seller has the power to raise prices, or impose other burdensome terms

---

74. Witnesses from CMI and Comdisco testified that neither company knew that IBM sold upgrades (including the J to K) without IBM labor included. *See* Lewis, Tr. 1721; Loria, Tr. 654–58; 660–61; Smith, Tr. 611–13. I do not credit such testimony, as there was documentary evidence (requests for IBM "SW" prices) to the contrary. DX 2265 (Smith); DX 2261, DX 2262, DX 2263 (Loria); DX 2260, DX 2266 (Lewis). Further, the SWRPQ procedure has existed since 1975. DX 2219. SWRPQ prices are readily available from IBM. *See* Ross, Tr. 1371–72; Robertson, Tr. 693–94; Ritchie, Tr. 1114, 1120. AMI acknowledged that SWRPQ prices are made available from IBM when specifically requested. A.P.F. at ¶ 99.

75. Using customer-owned parts, AMI charged Comdisco between $25,000 and $30,000 for installing an E to B upgrade, requiring approximately 20 man hours. Lewis, Tr. 1723. Based on Mr. Ross's calculations, the value of IBM installation service for an E to B upgrade, requiring about 13 man hours of labor, *see* DX 1926, is $2,400. DX 1085A. Based on these facts and Mr. Lewis' assertions, it is fair to conclude that Comdisco would not select AMI over IBM to install a new E to B upgrade if it had the choice. In view of this evidence, I do not accept AMI's assertion at closing argument that leasing companies "don't care whether the service costs $2400 or $20,000." Post Trial Oral Argument, Levy, at 30.

such as a tie-in, with respect to any appreciable number of buyers within the market."); *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 69 (4th Cir.1969) ("Acquiescence in the burdensome term by an appreciable number of customers gives rise to an inference" of economic power.); *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

The evidence established that buyers who complained about having to purchase IBM labor along with upgrade parts assumed that they could obtain installation labor from alternative sources, such at AMI, at prices comparable to or competitive with those of IBM. Based on the evidence, I conclude that no buyer would have regarded the purchase of IBM labor as "unwanted" or "burdensome" had it known of the disparity of prices at which IBM and AMI would provide installation labor if IBM discontinued net pricing. Absent net pricing, buyers would likely continue to use IBM installation services. Therefore, proof of the purchase of IBM's labor by buyers opposed to net pricing does not establish that IBM possesses the economic power to "force" or "coerce" buyers into buying a product they do not want. "If the product in the second market would be accepted anyway, because of its own merit then, of course, no leverage is involved; ... there is no use of the seller's market power." *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1218 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *see also Fortner II*, 429 U.S. at 618 n. 10, 97 S.Ct. at 867 n. 10 (The approach to establishing economic power suggested in *Advance Business Systems* "depends on the absence of other explanations for the willingness of buyers to purchase the package....").[76]

**4.**

There is no *per se* rule against tying arrangements "unless a substantial volume of commerce is foreclosed thereby." *Hyde*, 466 U.S. at 16, 104 S.Ct. at 1560; *see also Fortner I*, 394 U.S. at 501, 89 S.Ct. at 1258 (The "controlling consideration is ... whether a total amount of business, substantial enough in terms of dollar volume so as not to be merely *de minimis*, is foreclosed to competition by the tie.").

If Mr. Ross's unadjusted estimate of the value of the labor component of 308X MIPS upgrades is used, and that amount is multiplied by the number of such upgrades performed by IBM during the relevant time period, and those figures are added, the sum ($23,158,000) approximates the total value of the allegedly tied product.[77] *See* PX 461; Levin, Tr. 104. Mr. Ross's figures are based on 1985 prices for IBM labor and net-priced MESs. *See* DX 3001A. If the average of actual IBM net MES prices and labor prices for the relevant period are used, and the value of the fabrication component is taken into account, the result ($20,639.261) is a closer approximation of the total value of the allegedly tied upgrade labor. DX 3001B.

▮ Were the sole "relevant figure" the "dollar volume of all sales of the tied item", as AMI contends, A.R.M. at 31, I would conclude that AMI had satisfied the requirement of substantiality of effect on interstate commerce. *See, e.g., International Salt Co. v. United States*, 332 U.S. 392, 395–96, 68 S.Ct. 12, 14–15, 92 L.Ed. 20 (1947) ($500,000); *Fortner I*, 394 U.S. at 502, 89 S.Ct. at 1258 ($190,000). However, the *per se* rule's substantiality requirement reflects a concern with "impact on competition" and the amount of commerce foreclosed. *See Hyde* 466 U.S. at 16, 104 S.Ct. at 1560.[78] AMI has not shown that it en-

---

**76.** Even if there had been proof of acceptance by buyers of burdensome terms, such proof would be evidence of coercion, but would not, alone, "suffice to establish, prima facie, the coercion element of an illegal tie-in claim." *Ungar*, 531 F.2d at 1225.

**77.** The $23 million figure only approximates the total value of the allegedly tied labor component in part because it excludes fabrication labor and includes the value of the labor component of J

to K upgrades, which were optionally available on an SWRPQ basis.

**78.** In *Fortner I* the Court stated that the "relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit." 394 U.S. at 502, 89 S.Ct. at 1258. AMI's portion of the foreclosed volume of commerce is not at issue here. The

gaged in an activity foreclosed by IBM's net pricing. Upgrade services on 308X computers were materially different from upgrade work on predecessor computer systems. Nor has AMI shown that it would have engaged in the 308X upgrade business but for net pricing. AMI has failed to establish the "adverse impact on competition" with which the antitrust laws are concerned "because no portion of the market which would otherwise have been available to other sellers has been foreclosed" by IBM. *See Hyde,* 466 U.S. at 16, 104 S.Ct. at 1560.

### D.

■ Even if not *per se* unlawful, a business practice may violate the antitrust laws if it is found to impose an unreasonable restraint on competition under the Rule of Reason analysis. *See, e.g., Hyde,* 466 U.S. at 29, 104 S.Ct. at 1567; *Fortner I,* 394 U.S. at 503, 89 S.Ct. at 1258. AMI contends that IBM's net pricing is unlawful under the Rule of Reason. A.M. at 49. "The Rule of Reason ... focuses directly on the challenged restraint's impact on competitive conditions." *National Soc'y of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). It entails an analysis of the purposes and effects of an allegedly anticompetitive practice. *See United States v. American Tobacco Co.,* 221 U.S. 106, 179, 31 S.Ct. 632, 648, 55 L.Ed. 663 (1911).

■ A finding of illegality under the Rule of Reason "presupposes a determination.... that the 'effect upon competition in the marketplace is substantially adverse.'" *Columbia Metal,* 579 F.2d at 26 (footnote omitted). The percentage of business controlled by defendant and the strength of the remaining competition are relevant considerations. *See Times–Picay-*

*une,* 345 U.S. at 615, 73 S.Ct. at 884. I have already concluded that IBM large scale mainframe computers and upgrades to such computers face considerable competition from a variety of data processing products and services, the effect of which is to deprive IBM of the power to raise prices or impose burdensome terms, such as tie-ins, on buyers. *See NCAA,* 468 U.S. at 110 n. 42, 104 S.Ct. at 2965 n. 42 ("[T]he 'reasonableness' of a particular alleged restraint often depends on the market power of the parties"; market power is one test of reasonableness). The availability of wide-ranging alternatives to IBM net priced upgrades (and the parts involved in the upgrades)[79] precludes a finding that IBM's net pricing policy has any appreciable anticompetitive effect on the market as a whole. *See Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 537–38 (7th Cir.1986); *Will,* 776 F.2d at 671–74; *A.I. Root,* 806 F.2d 673; *Robert's Waikiki U-Drive, Inc. v. Budget Rent–A–Car Systems,* 732 F.2d 1403, 1408 (9th Cir.1984). Prof. Levin acknowledged that if there existed economically viable, reasonable, or realistic alternatives to IBM 308X upgrades, any anticompetitive effects of the alleged tie would be substantially mitigated if not completely eliminated. *See* Levin, Tr. 153–55; *accord* Baumol, Tr. 1645.

AMI has also failed to establish that net pricing has an anticompetitive impact on the market for 308X upgrade labor services. *See Hyde,* 466 U.S. at 29, 104 S.Ct. at 1567 (requirement that plaintiff prove that the contract "unreasonably restrained competition" involves "an inquiry into the actual effect of the exclusive contract on competition among anesthesiologists."); *see also Pitchford v. Pepi Inc.,* 531 F.2d 92, 101 (3d Cir.1975). The amount of labor involved in performing 308X MIPS upgrades is, for antitrust purposes, negligi-

---

*Fortner I* Court did not consider the situation in which the plaintiff bringing suit has failed to show it would or could have engaged in the commercial activity allegedly foreclosed by the tie.

**79.** Besides buying net-priced upgrades, buyers wishing to increase their data processing capabilities may: buy replacement or additional

computers of various sizes and processing power; add input/output devices; select appropriate software; install upgrades with used parts; subcontract to computer services and service bureaus; and to a more limited extent, swap machines or upgrades. *See supra* pp. 271–277.

ble, and AMI has failed to show that it could compete with IBM for the provision of 308X upgrade services if a market for such services existed as a result of IBM's discontinuation of net pricing. The evidence also warrants the conclusion that no other third party fabricator would be able to compete effectively. *See* Baumol, Tr. 1645–46.

Although AMI has failed to establish that IBM's net pricing policy had an appreciable adverse impact on competition, it is desirable under the Rule of Reason analysis to review IBM's reasons for implementing 308X net pricing:

> While the antitrust laws regulate conduct, as distinguished from intentions, ... "the reason for adopting the particular remedy [and] the purpose or end sought to be attained ... are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge or intent may help the court to interpret facts and to predict consequences."

*Alberta Gas Chemicals Ltd. v. E.I. duPont de Nemours & Co.*, 826 F.2d 1235, 1251 (3d Cir.1987) (Becker, J., dissenting) (quoting *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)); *see Times Picayune*, 345 U.S. at 615, 73 S.Ct. at 884 (Reasonableness inquiry under Section I focuses in part on "whether the action springs from business requirements or purpose to monopolize."); *see also NCAA* 468 U.S. at 104 n. 26, 104 S.Ct. at 2961–62 n. 26 (tying arrangements "may have procompetitive justifications that make it inappropriate to condemn without considerable market analysis."). *But see H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 246 (5th Cir.1978) ("Absent anticompetitive effect, an unlawful intent will not establish a rule of reason violation....").

### 1.

IBM introduced evidence of legitimate business justifications for its 308X net pricing policy. In addition, Michael Armstrong, the IBM executive who decided in 1980 to apply net pricing to the 308X product line, testified that IBM's management did not consider the impact net pricing might have on third party fabrication and installation activity, in part because it regarded the amount of labor involved as trivial. Armstrong, Tr. 903–05. I credit Mr. Armstrong's testimony.

The principal goal sought to be served by net pricing was the prompt and proper return of TCMs removed from upgraded 308X computers. Reusability was a key design objective incorporated into the TCM technology. *See* Armstrong, Tr. 902–03, 904–05; Toole, Tr. 1012–13; Ross, Tr. 1365–67; DX 1136, p. 2. By 1978, IBM assumed that a large portion of the TCMs to be used in 308X computers, upgrades, and field spares would come from TCMs removed from installed equipment and converted into equivalent-to-new (ETN) condition. The reusability of TCMs was "critical to the pricing" of the 308X product line. Ross, Tr. 1365–66; DX 1136, p. 2. IBM assumed that 25 to 30 percent of the total component demand for the 308X series would be met with reused components. Ross, Tr. 1366. The ETN program allowed IBM to maximize its supply of 308X machines and upgrades, and reduce unit cost, in part by avoiding having to construct additional manufacturing facilities. *See* Ross, Tr. 1365–67; Toole, Tr. 1011. But for the reusability of TCMs, IBM "would have not been satisfying the market requirements." Armstrong, Tr. 902–03. An IBM official testified that, in 1980, IBM faced a shortage of supply of TCMs and that, but for the ETN program, the effect of the shortage on the 308X program would have been "unquantifiable but devastating." Toole, Tr. 1017.

IBM has converted tens of thousands of TCMs into ETN condition and reused them in 308X processors and upgrades. *See* Ross, Tr. 1366. It is faster and less expensive to ETN a TCM than to build a new one: a TCM can be ETN'd in one or two weeks on IBM's manufacturing line (involving about 25 operations) as opposed to 6 to 9 months to make a new one (involving about 325 operations). Toole, Tr. 995–96;

Granito, Tr. 949; DX 1850. The ETN procedure costs IBM less than $6000 per TCM. Toole, Tr. 1028–29; Baumol, Tr. 1691. The manufacturing cost of a TCM is $12,000.[80] Granito, Tr. 981–82. Once ETN'd, TCMs are marketed as if new and sold at prices for new TCMs. Toole, Tr. 1008–09, 1030–31.

The success of the ETN program, critical to the marketing and pricing of TCMs, depended on the proper handling of removed TCMs and a careful monitoring of the number and types of operations performed on them. Granito, Tr. 945–47; Ross, Tr. 1412. According to Mr. Ross, IBM could reuse TCMs only "[i]f we knew and we got them back on a timely manner and we understood the ... precise condition of those TCM's" when they were returned. Ross, Tr. 1412. "[I]t is the number of times those TCMs are plugged and unplugged and capped and uncapped that is critical, and without knowing which machine they came from, we would have no assurance as to their quality or their usability." *Id.* Since 1979, IBM has tracked each manufactured TCM by serial number to be certain that each TCM is reused within the guidelines established for TCM reuse. Granito, Tr. 946–47. TCMs exceeding IBM's reusability guidelines are scrapped. *Id.*

IBM could not rely on other parties to observe the TCM handling guidelines necessary to preserve the reusability of TCMs, or even to return parts removed during the installation of a net priced upgrade. *See, e.g.,* Van Hellemont, Dep. Tr. 174–76; Allen, Dep. Tr. 88–89, 527–28, 1324–35; DX 88; DX 89; DX 90; Smith, Dep. Tr. 214–15. Further, as an IBM official explained, the credit-for-return system suggested by AMI as a replacement to net-pricing was unworkable. *See* Ross, Tr. 1377–78. AMI

offered no testimony on the subject of a credit-for-return system.

IBM's net pricing policy was and is a legitimate and reasonable way to ensure the prompt and proper return of TCMs needed to sustain the ETN program and the commercial success of the 308X line of products.[81] Net pricing facilitated the development and marketing of TCM technology, and thereby enhanced technological progress and economic competition in the data processing industry. Given the existence of legitimate reasons for net pricing, and the fact that its procompetitive effects outweigh its virtually nonexistent anticompetitive impact, I conclude that AMI's rule of reason challenge to net pricing fails.

2.

Although I find that the record as a whole does not support AMI's assertion that net pricing was IBM's "solution to third party fabricator competition", *see* A.M. at 13, there is some evidence tending to suggest the contrary. Most important is the fact that IBM applies net pricing to numerous 308X memory upgrades that do not require the return of TCMs.[82] Lewis, Tr. 1738. IBM's net pricing of such upgrades is inconsistent with IBM's principal stated justification for net pricing and therefore raises doubts about IBM's motives. *See, e.g., White Motor Co. v. United States,* 372 U.S. 253, 270 n. 9, 83 S.Ct. 696, 705 n. 9, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring) (Restriction on competition which is broader than reasonably necessary to achieve defendant's legitimate needs "invites suspicion."). However, not all such memory upgrades are net priced (only those involving the removal of other key parts are), and no 308X channel upgrade (also not requiring the return of TCMs) is

---

**80.** This figure does not include IBM's TCM research and development costs. Granito, Tr. 982.

**81.** It is worth repeating that IBM requires the return of removed TCMs only when a new net-priced upgrade is bought from and installed by IBM. Over 90 percent of IBM's 308X computers are privately owned; the owners of those computers can do as they wish with their TCMs. *See* DX 1847; PX 25; *see also* Baumol, Tr. 1692–93.

**82.** The evidence does not establish the total value of net priced 308X memory upgrades which incorporate only the older MST technology, but AMI counsel put the figure in the "many millions of dollars" range. A.R.M. at 2. IBM does not dispute AMI's assertion that, in 1984, IBM's revenues from the sale of all net priced memory upgrades exceeded $70 million. *See* A.P.F. at ¶ 79.

net priced. AMI does not claim that IBM's net pricing of non–TCM 308X memory upgrades constitutes a distinct antitrust violation, and there was little evidence at trial concerning memory upgrades.

What AMI regards as direct evidence of IBM's anticompetitive intent is minimal and does not outweigh the ample evidence of IBM's legitimate business reasons for implementing net pricing. AMI established that IBM knew that at least one major leasing company was dissatisfied with IBM MES delivery and installation schedules, *see* A. Carr, Dep. Tr. 249, 26, 32–33, 80–81, 97–99, that IBM was aware of increased third party installation activities, and that IBM considered how to respond to such activities. For example, Mr. Gibson stated in an IBM internal memorandum dated April 19, 1983, that it "has become apparent that more and more MESs are being installed by third parties...." PX 137. However, Mr. Gibson testified that he was referring to the installation of SWRPQ upgrades, which are not affected by net pricing. Gibson, Dep. Tr. 191–192. Similarly, Mr. Biggar, President of IBM's Field Engineering Division (FED), reported in December, 1982, that employees in the division raised "concerns regarding third party installing IBM MESs on IBM systems", including the concern that third parties were able "to cut the price on installation" of MESs sold without IBM labor included, and that some of the concerns had to be resolved "in order for FED to maintain the feature installation business in a competitive and professional manner." PX 277. However, the memorandum does not state whether it refers to 308X or 303X equipment, or both, or whether it involved model, memory, or channel upgrades.

As the preceding examples illustrate, most if not all of the documents and statements upon which AMI relies to show that net pricing reflected anticompetitive designs have limited probative value because they were made or written on unknown dates or over two years after IBM decided to implement net pricing.[83] It is also unclear whether much of the evidence involves 308X upgrade activities; 303X upgrade work; general reconfiguration work; or removal and reinstallation activity involving customer owned parts and equipment. *See* PX 119; PX 275. Such removal and reinstallation activity is unrelated to IBM's net pricing policy.

### 3.

▮▮▮ IBM also offered evidence of procompetitive justifications for its OTC price structure, discussed *supra* note 10, and its serial number designation policy, under which customer orders for IBM features, model conversions, or RPQs had to be accompanied by a designation of the serial number of the machine on which the ordered parts were to be installed. *See* DX 1325, p. 1; PX 168, p. 1; PX 377, pp. 89712–13; Ritchie, Tr. 1090–93. The policy did not apply to OTC parts. Neither practice individually is the basis of a claim by AMI,[84] and neither practice, alone or in conjunction with the other, or with net pricing, imposes an unreasonable restraint of trade.

### a.

IBM priced the TCMs comprising an upgrade so that the aggregate price of the TCM's equalled or exceeded the price of the upgrade. IBM sought to ensure that customers would not buy the parts instead

**83.** For example, AMI refers to the fact that the following question was posed to Mr. Armstrong at an IBM presentation in 1982: "Should IBM resist third party expansion into labor intensive activities, such as feature/model addition and removal, equipment relocation and maintenance?" PX 119 at 48690; *see also* PX 275; Gibson, Dep. Tr. 376–77. AMI also introduced an IBM Agenda containing "RECOMMENDATIONS" for "ACTIONS ON RECONFIGURA-

TION" in which the following appears: "NET PRICED MESs INSTALLED BY IBM." PX 272. The document is undated.

**84.** For example, AMI does not discuss the serial number designation policy in its post-trial memorandum of law. In its post-trial reply memorandum, AMI states that it would have no complaint concerning the serial number requirement if "parts are available from IBM as a viable alternative." A.R.M. at 35.

of the upgrades they comprised,[85] since IBM's profit projections for the 308X line of products were based in part on its sale of 308X upgrades. *See* Ross, Tr. 1370–75.

In some cases the upgrade price is well below the aggregate TCM price because some of the TCMs are also used in other, more expensive upgrades and were priced based on those upgrade prices. *See* Ross, Tr. 1373. IBM's OTC pricing structure provided a reasonable mechanism to facilitate IBM's recovery of its substantial investment in 308X technology. *See* Ross, Tr. 1376. Prof. Baumol testified that it was proper and often necessary to price parts at a level equal to or exceeding the price of the completed product the parts make up, especially in industries (such as the data processing industry) where continued technological progress depended on the recovery of research and development expenditures. Baumol, Tr. 1667–68; *see also* Levin, Tr. 862–63.

AMI essentially contends that the OTC price for the parts of an upgrade must be less than the upgrade price by an amount equal to the value of the fabrication and installation labor involved in the upgrade. *See* Levin, Tr. 80–81, 96–97, 156–57, 165. Even if there were legal support for the proposition,[86] because AMI is not entitled to an aggregate parts price that is below the upgrade net price by an amount greater than the price of the service component, the aggregate parts price to which AMI would be entitled under such a theory would leave too small a margin for AMI to offer upgrade services in competition with IBM.

b.

IBM announced its serial number designation policy in June of 1979. The policy "applies to everyone", Ritchie, Tr. 1094, including AMI, leasing customers, and end-users. *See* Loria, Tr. 639, 670; Bigando, Tr. 1242–43. Prior to 1979, purchasers were permitted to and did order features against "zero serial numbers", *see* PX 169, a practice which enabled purchasers, especially leasing companies, to inventory IBM MESs. In April, 1979, Mr. Gibson of IBM reported that 41 percent of all MESs ordered from IBM were for "zero serial numbered MES orders." PX 169 at 50883. Prof. Levin testified that IBM's policy inhibited "the flexibility of leasing companies", and limited "their ability to respond in a speedy fashion" to customer needs. Levin, Tr. 82–83. A Comdisco official stated that the serial number requirement gave his company "fits" and cut down on its "flexibility". Pontikes, Dep. Tr. 49–50. Yet there was evidence that leasing companies and other third parties were able to inventory parts despite IBM's policy. *See, e.g.,* DX 197; Nolin, Dep. Tr. 59–60, 68–69. The large number of IBM computers owned by the leasing companies provided them with a valuable source of necessary parts and machines against whose serial numbers to order and redesignate ordered parts from IBM. *See A.P.F. at ¶ 197; Robertson, Tr. 725–26, 727–28; A. Carr, Dep. Tr. 197–200, 202–03, 283–84.*

The legitimate business interests of IBM served by the serial number designation policy are not outweighed by the leasing companies' desire for greater flexibility. Mr. Ritchie of IBM testified that the policy was implemented in part to address planning and production problems faced by IBM as a result of the large number of speculative orders for MESs the company received: IBM "had a backlog of orders which—many of which never got installed." Ritchie, Tr. 1092–93; *see also* PX 377, at 89712–13. The serial number designation policy is also an integral part of IBM's computerized system for keeping track of

---

**85.** Similarly, the net priced upgrade prices were set so as not to impact adversely on IBM's sale of processors. Ross, Tr. 1370–71, 1375; *see also* Levin, Tr. 163–64. Upgrade prices equalled the price-differentials of computer models. *See* DX 1861.

**86.** I am aware of no decision in which a non-predatory price was found to violate the antitrust laws because it was too high. *See, e.g., Kartell v. Blue Shield, Inc.,* 749 F.2d 922, 927 (1st Cir.1984), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985); *Fairdale Farms, Inc. v. Yankee Milk, Inc.,* 715 F.2d 30, 32 (2d Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 174 (1984).

information critical to maintaining, updating, and reconfiguring IBM computers. IBM's Machine Level Control (MLC) records, which are kept on the basis of machine serial numbers, enable IBM to perform numerous tasks accurately and promptly, including: assembling particular features or model conversions (MESs); providing appropriate EC's (modifications periodically installed on computers to correct design difficulties); and shipping the appropriate parts involved in upgrades. *See* Bigando, Tr. 1235–41; Nolin, Dep. Tr. 126–27; Chisholm, Dep. Tr. 95; PX 377 at 89708, 89717; Granito, Tr. 964; Morrow, Dep. Tr. 149. When the serial number and desired configuration change are "loaded" into the MLC system, the system automatically identifies the parts, instructions, microcode diskettes, and any ECs required to install the upgrade. Bigando, Tr. 1238–40. Thus, the compatability and proper functioning of IBM upgrades depends largely on the accuracy of IBM's MLC records. *See, e.g.*, PX 377, at 89708; Lewis, Tr. 523; Allen, Tr. 251–52.

That there may be arguably comparable ways to maintain updated MLC records, *see* Beckwith, Tr. 1340, does not, contrary to AMI's assertion, *see* A.P.F. at ¶ 203, make IBM's policy unreasonable. Similarly, IBM's acknowledgment, in April 1979, soon before announcement of the policy, that 41 percent of the MESs ordered from IBM were "zero serial numbered MES orders", does not, given IBM's valid explanations for the policy, support an inference that the policy, alone or in conjunction with other IBM practices, reflected an anticompetitive design.

### E.

In order to establish a cause of action under either a *per se* or rule of reason analysis, AMI "must demonstrate both that the antitrust laws were violated and that it suffered 'fact of damage' in consequence of that violation." *Pitchford v. Pepi, Inc.*, 531 F.2d 92, 98–99 (3d Cir.1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *accord Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1320 (5th Cir.1976) (plaintiff must show a violation of the antitrust laws, the fact of damage, and some indication of the amount of damage).

Because I conclude that AMI has failed to establish that IBM's net pricing policy was unlawful, I need not address IBM's contention, *see* IBM's Post–Trial Memorandum of Law (hereinafter "I.M.") at 15, that AMI has failed to prove it suffered an "actual injury" or an "antitrust injury", *i.e.*, an "injury of the type the antitrust laws were intended to prevent...." *See Cargill Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 490, 93 L.Ed.2d 427 (1986). However, I note that my finding that IBM's net pricing policy did not deprive AMI of viable business opportunity would seem to preclude a finding that AMI suffered the requisite injury to its "business or property", *see* Section 4 of the Clayton Act, 15 U.S.C. § 15, even if net pricing were somehow unlawful.

### INSTALLATION AND WARRANTY SERVICE CHARGE

▇ AMI contends that IBM's Installation and Warranty Service Charge (IWSC), which became effective on June 30, 1980, PX 67, unreasonably restrained trade in violation of Section 1. A.M. at 62–63. Payment of the IWSC entitled IBM customers to installation and warranty service on IBM computers or MESs bought in the United States or Puerto Rico and shipped to a foreign country during the initial twelve-month period following the sale.[87] PX 67; DX 1381, at 85598; DX 2221, p. 42; DX 1532, at 2. The legality of IBM's IWSC is determined under a rule of reason analysis. *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (legality of vertical restrictions limiting territories in which products are resold is to be determined under Rule of Reason).

---

**87.** The IWSC also applied to IBM equipment purchased abroad and installed (or reinstalled) in the U.S. or Puerto Rico. The main issue at trial was the legality of the IWSC as it affected exports from the United States.

## I.

Prior to the implementation of the IWSC, IBM's standard U.S. purchase agreements (for computers and MESs) provided for the installation of the machine and a twelve-month period of limited warranty service (including the replacement of failed parts). *See* PX 608 at 3. The agreements excluded warranty coverage for computers installed outside the U.S. or Puerto Rico.[88] *See, e.g.,* DX 2121 at 3; Ritchie, Tr. 1097; Beckwith, Tr. 1306. Notwithstanding the limitation, IBM, as a matter of practice and generally at no additional cost to its customers, *see* PX 67, continued to provide warranty service on exported machines through its offices abroad. Ritchie, Tr. 1097. IBM's practice was consistent with that of other U.S. Computer manufacturers. PX 71.

A "very substantial" and rapid increase in the movement of IBM computers from the U.S. to foreign and primarily European countries in early 1980 precipitated IBM's announcement of the IWSC, and its discontinuation of the practice of extending warranty service at no extra cost to equipment shipped abroad. Ritchie, Tr. 1097–98; Beckwith, Tr. 1307; Rizzo, Tr. 1213. If buyers wanted fixed-cost IBM installation and warranty service abroad, they had to pay the IWSC. In July, 1980, IWSC fees ranged from 10 to 14 percent of the purchase price of 303X machines, or between $250,000 and $724,000. PX 452; Levin, Tr. 70. The IWSC did not provide for a rebate or refund of the price of the limited warranty service included in the purchase price, but did give the customer a credit for the out-of-pocket costs saved by IBM if the machine was not initially installed in the country of purchase (IBM kept whatever

mark-up there was for the installation service). *See* Levin, Tr. 72–73.[89]

The increase in the number of customer shipments of IBM computers in early 1980 reflected an international currency imbalance which made it profitable for IBM customers, such as leasing companies, to buy IBM computers in the U.S. and market them in a number of foreign countries in competition with IBM.[90] *See, e.g.,* Lewis, Tr. 466–67; Levin, Tr. 69. Comdisco, for example, in early 1980, purchased new IBM equipment in the U.S. to market in Europe. Lewis, Tr. 467; *see also* PX 61. The addition of IBM's IWSC to the purchase price of a new computer made the export of the machine commercially less attractive and reduced the flow of on-warranty equipment shipped by leasing companies.

Computers purchased in the U.S. and installed in Europe (or in parts of Japan) had to undergo electric cycle conversions in order to function on foreign electrical currents.[91] Allen, Tr. 282–83; Levin, Tr. 60–61. In 1980, AMI was engaged in the business of performing cycle conversions on IBM large scale mainframes. Allen Tr. 283; Lewis, Tr. 459; Smith, Tr. 594. The decline in the shipping activities of the leasing companies resulted, at least temporarily, in a loss of business opportunity for AMI. *See* Allen, Tr. 386.

In 1981, AMI itself became interested in the cross-border shipment of new IBM computers. AMI considered buying two 308X computers abroad at European prices and marketing them in the U.S. Allen, Tr. 285. According to Mr. Allen, the IWSC costs of $355,630 for one machine and $345,080 for the other made the import and cycle con-

**88.** After institution of the IWSC, IBM's standard purchase agreements continued to contain "essentially ... the same limited warranty." Ritchie, Tr. 1102; *see also,* DX 2121, at 3; DX 829, at 1; DX 2124, at 5.

**89.** Due to the difficulties of administering the IWSC and the number of customer complaints about the policy, especially from leasing companies, IBM discontinued the IWSC as of January 1, 1985. DX 2220, at 16; PX 56, at 1; PX 60; Beckwith, Tr. 1308; Ritchie, Tr. 1101; Robertson, Tr. 700. Although AMI criticizes IBM's

post-IWSC policy, it does not assert a claim based upon it.

**90.** Third party leasing companies, such as Comdisco and CMI, competed with IBM for the placement of large scale mainframe computers with end users in foreign markets. PX 71.

**91.** Large scale mainframes operate on 60 cycle electric power in the U.S., and on 50 cycle electric power in Europe and parts of Japan. Lewis, Tr. 459

version of the computers economically unattractive.[92] Allen, Tr. 285–86.

## II.

AMI contends that IBM's IWSC policy had the unlawful purpose and effect of preventing AMI (and other third party fabricators) from performing cycle conversions of new IBM computers and leasing companies from exporting, importing, and marketing those machines in competition with IBM. *See* A.P.F. at ¶ 218. AMI also claims that it too was prevented by the IWSC from engaging in the business of cross-border shipments of new IBM computers. A.R.M. at 56. IBM argues that AMI lacks standing to challenge the IWSC under either theory. I.M. at 43–44. I disagree.

### A.

■ It is "as unlawful to prevent a person from engaging in a business as to drive him from it." 2 P. Areeda & D. Turner, *Antitrust Law*, § 335 c at 174 (1978); *see also Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir.); *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985); *Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 474–475 (7th Cir.1982); *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983); *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 994 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Generally, "a potential competitor has standing if he can show a genuine intent to enter the market and a preparedness to do so." *Bubar*, 752 F.2d at 450; *see also Grip–Pak*, 694 F.2d at 474–75 (plaintiff "may be able to recover lost profits as a manufacturer even though it has not yet

started manufacturing, it it had reasonable prospects of doing so which [defendant] snuffed out.").

AMI has made the necessary showing. AMI had experience in the cycle conversion business and had converted IBM computers for shipment abroad. In 1981, AMI had customers who were interested in two 308X computers which could not be purchased in the U.S. without delays. The customers were willing to pay a premium to obtain the machines promptly and AMI considered importing and cycle converting two computers from Europe to meet their needs. AMI regarded fixed-cost IBM warranty service coverage as necessary to the success of the deal, and the only way to obtain such warranty service from IBM at the time was to pay the IWSC. *See* Levin, Tr. 75–76. AMI therefore requested and received an IWSC RPQ from AMI's IBM salesman. The added cost of the IWSC (and AMI cycle conversion service) exceeded the premium the customers were willing to pay. Allen, Tr. 284–86. These facts establish AMI's intent and preparedness to purchase computers for cycle-conversions and cross-border sales, even though AMI did not pay the IWSC.[93]

### B.

■ AMI also has standing to challenge the IWSC by virtue of its participation in the cycle conversion business. U.S. manufactured IBM computers could not be marketed abroad without undergoing cycle conversions, and the cycle conversion business depended on the exportation of computers. AMI performed cycle conversions for Comdisco, CMI, Standard and Chartered Leasing, Techtronics, Volkswagen of America, and other companies. Allen, Tr. 283; Lew-

---

**92.** Although the machines on which AMI requested IWSC quotations were more expensive (in U.S. dollars) to buy in Europe than were equivalent machines in the U.S., Allen Tr. 393; Levin, Tr. 228–29, Mr. Allen hoped to be able to sell them at a price exceeding the difference because of the relatively short supply of the computers in the U.S. Allen, Tr. 285, 391–92. Mr. Allen testified that "the customers who wanted these machines were willing to pay a premium." Allen, Tr. 285.

**93.** I need not agree with AMI that there existed no viable substitute for IBM service warranty under the IWSC to conclude that AMI has standing to test the legality of IBM's policy. The focus of the standing inquiry under Section 4 is not "whether a business practice violates the antitrust laws, but whether a particular plaintiff may recover damages from the effects of the arguably unlawful practice on him or her." *Bogus v. American Speech & Hearing Ass'n*, 582 F.2d 277, 284 (3d Cir.1978).

is, Tr. 459; Smith, Tr. 594. The cycle conversion business was profitable for AMI. *See* Allen, Tr. 286. AMI typically charged between $70,000 and $80,000 for each conversion. *Id.* Comdisco regarded AMI's work as excellent, and CMI used AMI for all of its cycle conversion work. Lewis, Tr. 459–60; Smith, Tr. 594. Prior to the implementation of the IWSC, AMI performed cycle conversions on new IBM computers. *See* Allen, Tr. 386. IBM's IWSC inhibited but did not preclude the cross-border shipment of new IBM computers by the leasing companies and limited AMI's cycle conversion business.

The IWSC's impact on AMI's business was not, contrary to IBM's assertion, too remote or speculative to grant AMI standing to sue.[94] The alleged injury to AMI's business was, under AMI's theory, "inextricably intertwined with the injury (IBM) sought to inflict" on the leasing companies. *See Blue Shield of Va. v. McCready,* 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed. 2d 149 (1982). The harm to AMI's business was forseeable to IBM. *See id.* at 479, 102 S.Ct. at 2548. The IWSC impacted directly on AMI's business. *See Bravman,* 552 F.2d at 100. AMI was "within that area of the economy ... endangered by a breakdown of competitive conditions" allegedly resulting from the IWSC. *Blue Shield,* 457 U.S. at 480, 102 S.Ct. at 2549 (quoting *In re Multidistrict Vehicle Air Pollution M.D.L. NO. 31,* 481 F.2d 122, 129 (9th Cir. 1973)).

### III.

In order to prevail under Section 1 of the Sherman Act, AMI must prove that IBM's IWSC constitutes a "contract, combination ... or conspiracy" which unreasonably re-

strains trade. *See* 15 U.S.C. § 1. AMI has failed to make either showing.

### A.

 AMI does not contend that IBM engaged in a conspiracy. AMI argues that the existence of the necessary contract or combination was established by evidence that IBM obtained the unwilling agreement of third parties, including leasing companies, to pay the IWSC. *See* A.R.M. at 52. According to AMI, IBM thereby entered into an unlawful contract or combination. *See id.* at 55.

The flaw in AMI's contention is that payment by third parties of the IWSC, and thus the formation of a contract or combination, did not adversely impact on AMI's business. Under AMI's theory, payment of the IWSC enabled third parties to export IBM computers, and this favored AMI's cycle conversion business. Thus, AMI performed cycle conversions on new IBM computers in 1984, after AMI's customers paid the IWSC. Beckwith, Tr. 1310; Allen, Tr. 389–90. Although AMI may have been better off without the IWSC, it was not harmed when leasing companies paid the IWSC. What AMI contends injured its business was IBM's 1980 announcement that it would discontinue providing warranty service (at no extra cost) to U.S. machines exported during the initial twelve-month warranty period, since the announcement of the IWSC stemmed the flow of third party shipments. The alleged harm derived not from the contract or combination, as in the principal cases upon which AMI relies, *see Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), but from IBM's unilateral deci-

---

**94.** IBM does not contend that granting standing to AMI will create the risk of duplicative recovery involved in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) and *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958 (3d Cir.1983) *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984). IBM's position is that AMI was an insufficiently "direct" victim of the alleged harm to allow it to recover damages. *See* I.M. at 43; *see also Asso-*

*ciated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 540, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983). That AMI, as a business engaged in cycle conversions, did not (like the leasing companies) compete with IBM in the placement of computers with end-users is nondispositive. *See, e.g., Bravman v. Bassett Furn. Industries, Inc.,* 552 F.2d 90, 96 (3d Cir.1977).

sion and policy.[95] IBM independently instituted the IWSC, and such independent action is not proscribed by Section 1. *See, e.g., Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

### B.

AMI contends that "[t]he IWSC had the purpose and effect ... of eliminating" competition in foreign commerce. A.M. at 62. Assuming that AMI established the existence of a contract or combination under Section 1, I find, based on "all of the circumstances of [the] case," *see GTE Sylvania*, 433 U.S. at 49, 97 S.Ct. at 2557, that AMI has failed to prove that the IWSC constituted an unreasonable restraint of trade.

Although implementation of the IWSC dissuaded some leasing companies and AMI from shipping new IBM computers or MESs in competition with IBM, the IWSC's overall impact on competition was insufficiently adverse to support a finding of illegality. AMI has neither defined the relevant market allegedly affected by the IWSC nor attempted to measure the IWSC's impact on such a market. While lack of proof of a relevant market is not fatal to AMI's claim, *see Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 460, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986), an inquiry into market power and market structure helps determine the competitive impact of a challenged business practice under the Rule of Reason. *See e.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

Even as to companies which the evidence shows competed or were in a position to compete with IBM for the placement of IBM computers abroad, the IWSC did not impose an unreasonable restraint of trade. IBM did not condition the sale of its computer equipment upon payment of the IWSC. Nor did IBM require payment of the IWSC as a condition to the installation abroad of a machine bought in the United States. *See* Ritchie, Tr. 1099; *see also* Lewis, Tr. 532–33. Payment of the IWSC was optional. *See* DX 1381, at 2; *see also* Baumol, Tr. 1670–72, 1695–96. As an alternative to purchasing warranty service from IBM on an IWSC basis, customers interested in buying IBM computers in the U.S. and placing them abroad, and also interested in having them covered by warranty services, could: provide the installation and/or maintenance services themselves; obtain installation and/or maintenance services on a fixed-cost or time and materials basis from third-party service companies; or obtain such services from IBM on a time-and-materials basis. PX 57; PX 607G at at 24–25; Ritchie, Tr. 1099; DX 1381 at 2.[96] Based on evidence that end-users preferred fixed-price maintenance service over maintenance service on a time-and-materials basis, *see* Smith, Tr. 594–95, third-party fixed-cost installation and/or maintenance services provided the most viable alternative to paying the IWSC.[97] A number of companies were engaged in the provision of such services. *See* DX 1351 (e.g., pp. 6–10); Phillips, Tr. 1589–94.

Payment of the IWSC reduced but did not eliminate the business opportunity created by the currency imbalance. For example, in July, 1980, despite the IWSC, a differential exceeding $800,000 remained between the European and U.S. price (in U.S. dollars) for a typical 303X computer. PX 517, at 2; PX 452, *see also* PX 592, at 85635.

---

**95.** To the extent that AMI contends that IBM's enforcement of the IWSC (by collecting third party IWSC payments) was necessary to underscore the seriousness of IBM's IWSC announcement and produce the allegedly desired chilling effect on third party shipments, I would regard the argument as too speculative to establish the existence of the necessary contract or combination.

**96.** For computers bought in the U.S. and installed abroad, it was impossible to obtain IBM fixed-cost installation and/or maintenance service in the first year after the purchase of the machine without paying the IWSC. Levin, Tr. 75–76.

**97.** Third party installation and/or maintenance services may not have been perfect substitutes for IBM fixed-cost warranty services, *see* Lewis, Tr. 469, but they were a reasonable alternative.

AMI acknowledges that during the relevant time period "there were instances when it might have proved economically feasible to export machines from the United States even after paying the IWSC," A.P.F. at ¶ 225, but adds that these potential opportunities were closed by delays resulting from IBM's policy of quoting IWSC prices solely on a "request for price quotation (RPQ) basis." *Id.* Although he never requested an IWSC RPQ, *see* Smith, Tr. 615, Gary Smith of CMI testified that "the response time [for obtaining an IWSC RPQ] was too long." *Id.* at 592–93. Mr. Ritchie of IBM acknowledged that third parties interested in IWSC quotes complained about delays attributable to the RPQ process. Ritchie, Tr. 1148–49. However, there is no evidence that such delays resulted from anything other than IBM's inability to determine the appropriate IWSC more quickly. An IWSC was determined on a case by case RPQ basis and was prorated for the number of months remaining on the product's initial warranty. Lewis, Tr. 461–62; Smith, Tr. 592; Ritchie, Tr. 1095; DX 2221 at 42–43; PX 67. The IWSC was intended to reflect IBM's costs for providing warranty service abroad, and calculation of the IWSC depended on several variables, including the country in which the machine would be installed, the model type, and the machine's particular configuration. *See* DX 2221, at 42; PX 67, at 1; Levin Tr. 73–74. "The [IWSC RPQ quotes] could vary with different configurations." PX 73, at 1. IBM therefore did not publish a price list of IWSC charges. Mr. Smith of CMI testified that he told IBM that if he were to place an RPQ for an IWSC, he would need a response within a matter of hours. Smith, Tr. 616. There is no evidence that IBM could satisfy such a request.

The IWSC's impact on the shipping activities of leasing companies is difficult to assess but does not appear to have been preclusive. CMI, with offices in Geneva, Paris, London, Frankfurt, and Munich, continued to import and export used IBM machines (*i.e.,* machines off the initial warranty coverage and therefore not subject to the IWSC) after implementation of the IWSC, but did not import or export new computers. Mr. Smith of CMI testified that the IWSC "kept us" from importing or exporting new equipment. Smith, Tr. 595. However, it is unclear that CMI imported or exported new IBM equipment prior to the implementation of the IWSC. *See* Smith, Tr. 593–94. Mr. Lewis of Comdisco testified that Comdisco did not import or export new IBM MESs or features after institution of the IWSC "because of the RPQ surcharge", Lewis, Tr. 465–66; *see also* PX 61, but also stated that Comdisco "imported at least one" IBM computer under warranty during the IWSC period. Lewis, Tr. 538. He also acknowledged the possibility that Comdisco shipped other on-warranty computers during the same period. Lewis, Tr. 539.

The IWSC's impact on AMI's business was no more harmful. AMI continued to perform cycle conversions for leasing companies on used IBM equipment after the implementation of the IWSC, Allen, Tr. 286; indeed, its cycle conversion business grew during the IWSC period. *See* Allen, Tr. 286, 386–87; DX 1875A. Further, despite Mr. Allen's assertion that AMI's cycle conversion work on new IBM computers "in essence" stopped with the introduction of the IWSC, Allen, Tr. 283, AMI performed cycle conversions on new IBM computers in 1984 and performed more of such conversions in that year than in 1985, the year IBM discontinued the IWSC. Beckwith, Tr. 1310; Allen, Tr. 389–90.

### C.

AMI has also failed to establish that IBM's purpose in implementing the IWSC was anticompetitive. The weight of the evidence supports IBM's assertion that it instituted the IWSC in order to accommodate a growing number of customer requests for warranty service on exported machines and to recover substantial unanticipated costs associated with providing such service. IBM's one-year limited warranty on new machines expressly excluded coverage on machines placed outside the U.S. or Puerto Rico during the initial one-year period. *See supra,* pp. 298–299.

The main reason for the warranty limitation was IBM's desire "to supply IBM products and services through the IBM organization operating in the country where those products are installed or services rendered." DX 2221, p. 42; PX 67 p. 1. Mr. Robertson of IBM testified that "IBM sells equipment in the United States for installation and use within the United States." Robertson, Tr. 699.

The purchase price of new IBM machines subject to the limited warranty included only a price for installation and warranty services to be provided in the country in which the equipment was bought. Nevertheless, prior to the implementation of the IWSC, largely due to the fact that there were not a great number of cross-border shipments, IBM generally provided installation and warranty services to computers exported from the United States to Europe or Japan (and vice versa) during the initial warranty period at no additional cost. Ritchie, Tr. 1097. However, IBM never altered its express limited warranty provision or policy. DX 2221 at 42; PX 67 at 1. The increase in the cross-border movement of IBM equipment by IBM customers (including leasing companies) resulted in increased costs to IBM and disrupted IBM's planning for the provision of warranty and maintenance services. The avowed purpose of the IWSC, supported by the evidence, was to compensate IBM for the additional costs of providing installation and warranty services in a country other than the country of purchase, and to recover for IBM the associated, additional administrative expenses. *See* Ritchie, Tr. 1094—95; Beckwith, Tr. 1307–08; DX 2221, at 42; PX 67, at 1. The IWSC reflected IBM's cost of providing services for a machine during the remaining portion of the initial warranty period that the machines would be outside of the United States. *Id.; see also* Levin, Tr. 73–74.

AMI's assertion that the IWSC amounted to a double charge for IBM installation and warranty service is unsupported by the evidence. Prof. Levin acknowledged that

IBM gave customers a credit for its savings on out-of-pocket expenses if the new computer were placed initially in a country other than the country of purchase. IBM, therefore, did not charge customers twice for the costs of one IBM installation. Also, IBM incurred costs of planning for, and ensuring, warranty service (and the necessary administrative organization) in the country of sale whether or not the customer transferred the IBM equipment to another country. The cross-border shipment of the machine resulted in similar and additional costs for IBM for which it was not compensated by the original purchase. Ritchie, Tr. 1094–95; Beckwith, Tr. 1307–08; DX 2221, at 42; PX 67, at 1. AMI has not shown that the price of warranty service included in the original sales price compensated IBM for the warranty service provided abroad.

In an effort to show that the purpose of the IWSC was not to recover unexpected additional costs, AMI refers to the disparity between the IWSC quotes it received in 1981 for two 3081 D16 computers ($355,630 and $345,080) and IBM's 1985 price for fixed-cost maintenance services on similar computers in the U.S. ($63,801 per machine). A.R.M. at 49. Assuming that AMI's calculation of the fixed-cost maintenance service is accurate (there was no trial testimony on the subject), AMI's comparison is of minimal probative value because the two services compared are fundamentally different, involve computer equipment at different product-cycle stages, and are performed pursuant to contracts imposing distinct obligations on IBM.[98] *See* PX 69.

IBM refused to disclose to Comdisco the methodology and underlying details concerning the calculation of the IWSC. *See* PX 64 at 81598; PX 69 at 81593; PX 72 at 2221. IBM denied Comdisco's offer to pay IBM's actual, additional costs and its request to be able to purchase IBM's standard fixed-cost maintenance services during the first year of a new machine. *See*

---

**98.** As with IBM's OTC prices for 308X upgrade parts, to the extent that AMI asserts an independent claim on the theory that the IWSC price was unlawfully high, such a claim fails under the Sherman Act.

PX 64; PX 72 at 2221. IBM's denial of the latter request was based in part on the fact that the IWSC and the standard maintenance agreements provide for different services. *See* PX 69. These facts do not raise sufficiently serious doubts about the legitimacy of IBM's asserted business justification for the IWSC to support a finding that the policy was unreasonable or unlawful.

AMI's other attempts to establish that the IWSC reflected an anticompetitive purpose also fail. A handwritten, internal IBM memorandum regarding "Cross Border Transaction Proposal—Concerns and Recommendations" stated "There is an implicit assumption that 3rd party conversion will be eliminated." *See* PX 50 at 3918. AMI argues that the document shows that IBM intended the IWSC to eliminate third party cycle conversion activity. *See* A.M. at 65. However, although the document mentions "installation and warranty RPQ", it nowhere expressly refers to the IWSC and AMI produced insufficient evidence linking the document to the IWSC. AMI's interpretation of the memorandum does not follow from a reading of it. Further, the document is dated May 17, 1982, nearly two years after IBM instituted the IWSC.

Another handwritten document captioned "Objective" states, "Support country integrity through marketing and product supply", and "Prevent the non–IBM export of new machines." *See* PX 68. AMI contends that the document reflects IBM's desire to prevent, through implementation of the IWSC, the cycle conversion of new IBM equipment and the resulting competition from leasing companies exporting cycle converted equipment from the U.S. to Europe. A.M. at 64, 65. The document is undated and unsigned, and nowhere refers to the IWSC or any type of warranty service. AMI has failed to connect the document to IBM's IWSC.[99]

AMI also relies on an unsigned IBM document, dated November 12, 1984 (over four years after announcement of the IWSC) and consisting of numerous pages, one of which contains the following language: "Opportunity Analysis"; "Cross Border"; "IWSC is an Inhibitor (308X)." *See* PX 592 at 85633. Although at least two pages of the document expressly refer to the IWSC, (*see* PX 592, pp. 85633, 85635) and one contains apparently incriminating words, the document provides AMI with little support because AMI made no attempt at trial (or through discovery) to shed light on the meaning of the document or the page on which AMI relies. The disjointed language to which AMI refers is too thin a basis upon which to rest antitrust liability.[100]

\* \* \* \* \* \*

For the foregoing reasons, judgment will be entered in favor of IBM and against AMI on AMI's Section 1 claims based on IBM's net pricing policy and Installation and Warranty Service Charge.

---

**99.** At his deposition, Paul J. Rizzo, Vice Chairman of IBM and a member of IBM's Management Committee, stated that he was involved in the decision to institute the IWSC, Rizzo, Dep. Tr. 107–108, and that he thought the handwriting on PX 68 was his own. *Id.* at 105–06. At trial, Mr. Rizzo testified that although the handwriting on PX 68 was similar to his handwriting, he was positive that he was not the author of PX 68 and could therefore not recall any of the circumstances surrounding the document. *See* Rizzo, Tr. 1195–1199. Mr. Rizzo stated that the document was written by Phillip Guthoff, a member of IBM's Comparable Planning Staff, in 1980. Neither party called Mr. Guthoff as a witness. I find that Mr. Rizzo's trial testimony was credible.

**100.** As concerns the IWSC, this case is unlike *Eiberger v. Sony Corp.*, 622 F.2d 1068 (2d Cir. 1980), *cert. denied sub nom., Simplot v. Strobl*, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985), upon which AMI relies. For example, in *Eiberger*, Sonam exacted warranty service payments from its distributors even when no warranty services were provided. The warranty fees were designed and operated as penalties to enforce territorial restrictions. There was also an admission by a Sonam official that the warranty fees provided a "good system" "to protect our dealer's territory." *Id.* at 1073.